**HOUSING STUDY GROUP, et al., Plaintiffs,**

v.

**Jack F. KEMP, Secretary of Housing and Urban Development, et al., Defendants.**

**Civ. A. No. 90–0244.**

United States District Court, District of Columbia.

April 25, 1990.

Robert C. Seldon, John E. Bigstadt and Joseph A. Kijewski, Krooth & Altman, Washington, D.C., for plaintiffs.

Mark Nagle, Asst. U.S. Atty., Washington, D.C., for defendants.

MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

In this action for declaratory and injunctive relief, plaintiffs, two active mortgage bankers approved by HUD to be Federal Housing Administration ("FHA") coinsuring lenders with authority to provide financing and issue mortgage insurance for qualified multifamily housing projects, and a trade association of which the two mortgage bankers are members, challenge certain actions of officials at the Department of Housing and Urban Development ("HUD"). HUD Secretary Jack F. Kemp recently announced his intention to terminate HUD's coinsurance program under Section 244 of the National Housing Act, as amended, 12 U.S.C. § 1715z–9. In addition, certain pre-commitment review requirements were imposed on approved coinsurance lenders which mandated HUD approval prior to the issuance of any binding commitments. These requirements had never before existed.

On February 6, 1990, this Court denied plaintiffs' motion for a temporary restraining order and set a briefing schedule for plaintiffs' motion for preliminary injunction and defendants' dispositive motion. Since that time, defendants have filed a motion to dismiss certain portions of the complaint and briefing has been completed. The parties appeared before the Court on March 7, 1990 for argument on both motions. Having considered the pleadings, the argument of counsel, and the entire record, the Court shall grant plaintiffs' motion for preliminary injunction and grant defendants' motion to dismiss Counts IV and V of the complaint.

On April 19, 1990, plaintiffs filed a second motion for temporary restraining order and a preliminary injunction, seeking to enjoin the enforcement of an Interim Final Rule submitted by HUD to Congress on March 6, 1990 and published in the Federal Register on March 27, 1990. The proposed Interim Final Rule would establish the same precommitment review procedures which plaintiffs challenged in their original motion for a temporary restraining order and preliminary injunction. The effective date of the Interim Final Rule is April 26, 1990. Briefing on plaintiffs' second motion for a temporary restraining order has been completed. As explained below, the Court shall grant that motion as well.

## I.

The facts relevant to the instant motions are set forth in this Court's February 6, 1990 opinion and are incorporated here by reference.[1] Before turning to the merits, however, the Court pauses briefly to comment on the relief sought by the plaintiffs. In their motion for a temporary restraining order, plaintiffs did not seek to vitiate nor enjoin any of defendants' prior actions, including the issuance of Coinsuring Lender Letters Nos. 89–12, 90–1, and 90–2. Rather, concerned that defendants would take further action altering or terminating the coinsurance program, they sought to preserve the status quo as of January 23, 1990 (the date that Coinsuring Lender Letter No. 90–2 was issued) and requested an order restraining and enjoining defendants from "otherwise impairing the authority and autonomy of approved coinsuring lenders, or failing to follow the coinsurance regulations, as codified in 24 C.F.R. Parts 251, 252, and 255." *See* Memorandum Opinion, Feb. 6, 1990, 732 F.Supp. 180 ("Mem.Op."), pp. 15–16. However, "because [plaintiffs were] not seeking to enjoin any specific present or past action of defendants nor any action which defendants [were] contemplating taking within the next ten days," *id.* at 16, the Court denied plaintiffs' motion for a temporary restraining order.

---

1. The Court was advised at oral argument on the instant motions that the posture of this case had not, save in one respect, changed since the Court's ruling on plaintiffs' application for a temporary restraining order on February 6, 1990. The sole exception was the information gathered by defendants that through the month of January 1990 there had been twenty defaults on loans under the § 223(f) coinsurance program totalling approximately $114 million. This information had not been previously available to defendants nor made known to the Court.

The relief plaintiffs request on their motion for preliminary injunction is more expansive. Plaintiffs seek an order enjoining defendants from (1) giving any further force or effect to HUD's Coinsuring Lender Letters Nos. 89–12, 90–1 and 90–2, or HUD News Release No. 90–09, (2) taking any further action which impairs plaintiffs' authority as approved coinsured lenders, or (3) issuing any further legislative rules or regulations under the coinsurance program other than by the notice and comment procedures of section 4 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, and the procedures described in section 7 of the Department of Housing and Urban Development Act, 42 U.S.C. § 3535(*o*). *See* Motion for Preliminary Injunction. As explained below, plaintiffs are entitled to the preliminary injunctive relief they seek.

## II.

Plaintiffs have moved for preliminary injunctive relief only with respect to Counts I, II, and III of their complaint. Defendants have simultaneously opposed plaintiffs' motion for a preliminary injunction and moved to dismiss Counts IV and V of the complaint. Before turning to defendants' motion, the Court shall first address whether plaintiffs are entitled to a preliminary injunction.

**2.** On March 6, 1990, one day before the hearing on the instant motions, defendants filed the Declaration of Grady Norris, Assistant General Counsel of the United States Department of Housing and Urban Development ("Norris Decl."). *See* Notice of Filing, March 6, 1990. In his declaration, Norris advised that HUD had issued a new Interim Rule governing precommitment review for lenders participating in the coinsurance program which had been delivered to the appropriate committees of the House and Senate pursuant to the Department of Housing and Urban Development Act, 42 U.S.C. § 3535(*o*). The Interim Rule would, in effect, codify Coinsuring Lender Letters Nos. 89–12, 90–1, and 90–2. As permitted by that statute, HUD requested a waiver of the fifteen day pre-publication review period and the thirty day post-publication waiting period before the published rule would become effective. Were the waiver to be granted, HUD intended to publish the Interim Rule by March 26 or 27, 1990.

The Interim Rule, attached to Norris' declaration, states that "[w]ithout conceding that rule

A preliminary injunction may be granted only when the plaintiff demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that no other parties will be harmed if temporary relief is granted; and (4) that the public interest favors entry of a temporary restraining order. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977); *accord, Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir.1958). This test is not a wooden one, for as our court of appeals has noted, relief may be granted "with either a high probability of success and some injury, or *vice versa.*" *Cuomo v. United States Nuclear Regulatory Commission*, 772 F.2d 972, 974 (D.C. Cir.1985) (per curiam) (emphasis in original). *See also Holiday Tours*, 559 F.2d at 843.

### A. *Likelihood of Success on the Merits*

### 1. Notice and Comment Rulemaking

■ Counts I and II of plaintiffs' complaint, which form the core of their claims, allege that Coinsuring Lender Letters Nos. 89–12, 90–1 and 90–2 constitute substantive rules requiring notice and comment rulemaking pursuant to 5 U.S.C. § 553 and 42 U.S.C. § 3535(*o*). The Court agrees.[2]

making is legally required, and in the interest of extreme caution, HUD is issuing this Interim Rule to minimize the severity of any financial losses that HUD might suffer if the court were to preliminarily enjoin the Lender Letters for lack of rule making." Norris Decl., Attachment, p. 3.

In light of this action, the Court inquired at the hearing on March 7, 1990 as to whether a live case or controversy still existed sufficient to invoke federal jurisdiction. All parties agreed that a case or controversy did exist, as HUD intended to continue to give force and effect to Coinsuring Lender Letters Nos. 89–12, 90–1, and 90–2 until such time as the Interim Rule became effective. Furthermore, it was not known if or when Congress would grant the waivers; nor was it known when the interim rule would become effective.

Since the briefing on plaintiffs' motion for preliminary injunction and defendants' motion to dismiss was completed, the Court has been advised that HUD published the Interim Rule in the Federal Register on March 27, 1990 with the

5 U.S.C. § 553 requires agencies to afford notice of a proposed rulemaking and an opportunity for public comment prior to a rule's promulgation, amendment, modification, or repeal. However, Congress created several exceptions to these requirements. Relevant to the instant case is the exception for "interpretive rules, general statements of policy, or rules of agency organization, practice or procedure." 5 U.S.C. § 553(b)(A). Defendants argue that the Coinsuring Lender Letters at issue here constitute rules of "procedure" and are thus exempt from the normal notice and comment requirements.[3]

The Court's analysis begins[4] with the recognition that the purposes of the notice and comment requirements are dual: "to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies," *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C.Cir.1980), and to "assure[ ] that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 662 (D.C.Cir.1978).

Stated differently, "the purpose of § 553 is 'to enable[ ] the agency promulgating the rule to educate itself before establishing ... procedures which have a substantial impact on those regulated.' " *National Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C.Cir.1978) (footnotes omitted).

Accordingly, our circuit has repeatedly recognized that the exceptions to the notice and comment requirements of § 553 are to be construed narrowly. *See American Hospital Association v. Bowen*, 834 F.2d 1037, 1044 (D.C.Cir.1987) ("Congress intended the exceptions to § 553's notice and comment requirements to be narrow ones"); *Alcaraz v. Block*, 746 F.2d 593, 612 (D.C.Cir.1984) ("The exceptions to section 553 will be 'narrowly construed and only reluctantly countenanced' ") (citation omitted); *National Association of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C.Cir.1982), *cert. denied*, 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983) (exceptions to the notice and comment provisions of § 553 are to be recognized "only reluctantly," so as not to defeat the "salutary purposes behind the provisions").

---

effective date fixed as April 26, 1990. 55 Fed. Reg. 11,342. This Interim Rule is now the subject of plaintiffs' second motion for a temporary restraining order and preliminary injunction, which is discussed, *infra.*

**3.** Defendants maintain as a threshold matter that because the coinsurance relationship is based on a contract between HUD and the coinsurer (12 U.S.C. § 1715z–9; 24 C.F.R. § 251.2), § 553 is inapplicable to this case, as it specifically exempts from its coverage matters "relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). *See* Memorandum in Support of Defendants' Motion to Dismiss and in Opposition to Plaintiffs' Motion for a Preliminary Injunction, p. 6. Defendants recognize, however that HUD, by regulation, has voluntarily elected to proceed by rulemaking as to these matters even though such matters would not otherwise be subject to rulemaking by law or Executive policy. 24 C.F.R. § 10.1. Defendants also concede that the coinsuring lender letters meet HUD's regulatory definition of "rules." Nevertheless, HUD's own regulations, like § 553, authorize exemption from rulemaking for interpretive rules, statements of

policy and rules of procedure and practice. 24 C.F.R. § 10.1. Accordingly, the Court's analysis focuses on whether Coinsuring Lender Letters Nos. 89–12, 90–1, 90–2 and News Release No. 90–09 constitute "procedural rules" which are exempt from notice and comment rulemaking.

**4.** 42 U.S.C. § 3535(*o*) requires HUD to transmit, semi-annually, "an agenda of all rules or regulations which are under development or review by [HUD]." No such rule or regulation may be published for notice and comment before it has been transmitted first to Congress for review and no rule or regulation may become effective until after it has sat in Congress for an additional period of time after it has been proposed by HUD as final. In the instant case, plaintiffs' claim under § 3535(*o*) depends necessarily on the resolution of whether Coinsuring Lender Letters Nos. 89–12, 90–1, and 90–2 constitute substantive rules requiring notice and comment rulemaking pursuant to 5 U.S.C. § 553. Accordingly, the Court's discussion, *infra,* which is limited to whether the Lender Letters are substantive rules requiring notice and comment rulemaking or "rules of procedure" exempt from these requirements pursuant to 5 U.S.C. § 553(b)(A), encompasses plaintiffs' claim under 42 U.S.C. § 3535(*o*).

Agency actions or statements falling within the three exemptions in § 553(b)(A)

> are not determinative of issues or rights addressed. They express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities. They do not, however, foreclose alternative courses of action or conclusively affect rights of private parties. Although an agency empowered to enact legislative rules may choose to issue non-legislative statements, an agency without legislative rulemaking authority may issue only non-binding statements. Unlike legislative rules, non-binding policy statements carry no more weight on judicial review than their inherent persuasiveness commands.

*Batterton,* 648 F.2d at 702 (footnotes omitted).

At issue here is the third of the three exemptions contained within § 553(b)(A) for "rules of agency organization, procedure, or practice." The purpose of this exemption is to ensure "that agencies retain latitude in organizing their internal operations." *Batterton,* 648 F.2d at 707.

A useful articulation of the exemption's critical feature is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which parties present themselves or their viewpoints to the agency.

*Id.* (citation omitted). As was noted in *American Hospital Association,* 834 F.2d at 1047,

> Over time, our circuit in applying the § 553 exemption for procedural rules has gradually shifted focus from asking whether a given procedure has a "substantial impact" on parties, *see Pickus [v. United States Board of Parole],* 507 F.2d [1107] at 1112–13 [ (D.C.Cir.1974) ], to inquiring more broadly whether the agency action also encodes a substantial value judgment or puts a stamp of approval on a given type of behavior. The gradual move away from looking solely into the substantiality of the impact reflects a candid recognition that even unambiguously procedural measures affect parties to some degree.

Measured by this standard, Coinsuring Lender Letters 89–12, 90–1, and 90–2 are not "procedural rules" exempt from the notice and comment requirements of the APA. The Coinsuring Lender Letters at issue here can hardly be characterized as "house-keeping measures" or HUD's "tentative view of the meaning of a particular statutory term." Rather, they "alter the rights and interests" of approved coinsuring lenders.

Prior to defendants' actions, coinsuring lenders, once approved, had responsibility for issuing commitments with only minimal involvement by HUD.[5] This delegation of

---

**5.** HUD has codified three sets of regulations regarding the operation of the coinsurance programs at 24 C.F.R. Parts 251, 252, and 255. Each provides, with the exception of certain specified functions, that:

> [t]he lender is responsible for the performance of all functions under this part, including the acceptance and review of applications, issuance of commitments, inspections, and closings.

24 C.F.R. §§ 251.301(a), 252.301(a), 255.301(a).

The functions which HUD has reserved to itself are unrelated to the financial aspects of underwriting. They are (1) determining the previous participation in other HUD projects by the project's mortgagor, general contractor, consultant, and management agent; (2) preparing an environmental impact analysis; (3) considering equal opportunity in the development and operation of a program; (4) preparing an intergovernmental review for the federal government and involved states and municipalities; (5) complying with the National Historic Preservation Act; (6) actually endorsing the mortgage for coinsurance; and (7) enforcing and complying with federal labor standards and prevailing wage requirements. 24 C.F.R. §§ 251.301(b), (d), (e), 252.301(b), (d), (e), 255.301(b), (d), (e).

Endorsement is a *pro forma* act. Pursuant to regulation, HUD endorses a note if it identifies the coinsurance program, the percentage of risk shared by HUD and the lender, and the date of the note's endorsement. 24 C.F.R. §§ 251.407, 252.407, 255.407.

The coinsurance program handbook also demonstrates HUD's ministerial role in the process of issuing a firm commitment:

> The local HUD Office will have no responsibility for reviewing the processing or the documentation submitted other than to assure that the specific documentation required in ... this handbook is present, and the cover

authority makes sense in light of the rigorous standards and requirements that must be satisfied before HUD approves an applicant as a coinsuring lender under the coinsurance program.[6] The Coinsuring Lender Letters dramatically alter this delegation of authority, severely curtailing the ability of approved coinsuring lenders to issue firm commitments, that is, to contract with private borrowers to provide coinsured mortgage loans. Now,

> [w]hen a coinsuring lender has completed its processing of an application for coinsurance, *but prior to issuing* a legally binding conditional or firm commitment, the lender shall furnish to HUD Headquarters and to the HUD field office with the jurisdiction for the proposed project all documentation comprising the application. The Department *will not endorse* any mortgage loan for coinsurance until it has reviewed and found to be acceptable the underwriting and related loan commitment determinations by

the lender. The coinsuring lender may only issue a commitment upon receiving written notification from the Department that the loan processing is approved.[7] Furthermore, HUD will not honor firm commitments issued prior to January 16, 1990 unless it views "the outstanding commitment to be legally binding."[8] Also, as of July 11, 1989, "no new commitments for Retirement Service Center projects may be issued under the Section 221(d) and Section 223(f) Coinsurance programs."[9]

On face, then, the Coinsuring Lender Letters at issue here trample upon the substantive rights and interests of plaintiffs by interfering with and limiting their prior responsibility and authority to issue firm commitments and close coinsured loans.[10]

In arguing that the Coinsuring Lender Letters at issue here are mere "procedural rules" exempt from the notice and comment requirements of the APA, defendants rely primarily[11] on *American Hospital*

---

letter contains the specific representations set forth [therein]....
*HUD Handbook 4566.1, Subchapter 13–1(c).*

6. *See* 24 C.F.R. §§ 251.101–251.102, 252.101–252.102, 255.101–255.102.

7. Coinsuring Lender Letter No. 90–1 (emphasis in original).

8. Coinsuring Lender Letter No. 90–2.
    Defendants take issue with plaintiffs' claim that Coinsuring Lender Letters Nos. 90–1 and 90–2 do not define the standards to be used by HUD in *determining whether a commitment is* "legally binding" or whether the underwriting and related loan commitment determinations by the lender are "acceptable," allowing HUD to give written authorization to the coinsuring lender to make a firm commitment. Defendants advise that the letters do not impose undefined standards for precommitment review. Rather, the standards HUD applies in conducting precommitment reviews are the same standards to which participating coinsurance lenders are required to adhere in processing and underwriting loans. Those standards are set forth in the respective HUD Handbook applicable to each coinsurance program. Declaration of Matthew C. Andrea, Jr, Acting Director of the Procedures and Evaluation Division, Office of Multifamily Coinsurance Programs at HUD ("Andrea Decl."), ¶ 3. While "legally binding commitments" is not a defined term, HUD's standards and requirements for issuing conditional and firm commitments are published in the HUD Handbooks. *Id.* ¶ 4.

That HUD is not applying a different standard than that which the coinsuring lenders were previously required to apply does not diminish the fact that the rights and interests of the coinsuring lenders have been altered. Rather, it clearly demonstrates that HUD is taking away the responsibility and authority previously delegated and entrusted to the coinsuring lenders. In addition, it does not respond to plaintiffs' assertion that the Coinsuring Lender Letters have created a significant delay in the issuance of commitment by coinsuring lenders that never before existed which is adversely affecting the ability of the coinsuring lenders to profitably conduct business.

9. Coinsuring Lender Letter No. 89–12.

10. *See* Affidavits of John M. Laird, Vice President and General Counsel for plaintiff Centennial Mortgage, Inc., Terry L. Chuvala, Vice President in charge of Loan Origination and appraisal review for Centennial Mortgage, Inc., and Stephen H. Gardiner, President of plaintiff ABG Financial Services, Inc. ("ABG") and Chairman of plaintiff the Housing Study Group.

11. Defendants also assert that HUD's legal authority to provide pre-commitment review and approval or disapproval is preserved by HUD's regulations which provide that coinsuring lenders must agree "to abide by all applicable requirements issued by the Commissioner for performing its functions under this part," 24 C.F.R. §§ 251.102(b)(9), 252.102(b)(9), 255.102(b)(9). As the Court previously stated in its memoran-

*Ass'n v. Bowen,* 834 F.2d 1037 (D.C.Cir. 1987). Defendants' argument is unpersuasive.

*American Hospital Ass'n* involved a challenge by an association of 6,000 hospitals to certain directives issued by the Department of Health and Human Services ("HHS") governing the system of "peer review" of health care providers participating in the Medicare program. HHS issued the directives without undertaking the notice and comment rulemaking generally required by the APA. The court found that the directives were mere "procedural rules" exempt from notice and comment rulemaking. Whether the result in *American Hospital Ass'n* compels a similar result here requires, however, a closer examination of the circumstances and rationale underlying that decision.

In 1982, Congress amended the Medicare Act to provide for a new method of reviewing the quality and appropriateness of the health care provided by Medicare providers to Medicare beneficiaries. It did so by enacting the Peer Review Improvement Act of 1982, which required HHS to contract with "peer review organizations" ("PROs"), private organizations of doctors that would monitor some or all of the professional activities of the provider of Medicare services in their areas. In enacting this legislation, Congress sought to create a review system that would eliminate the excessive reimbursements to hospitals for treatments of Medicare patients. Under this Act, HHS was required to enter into a contract with a PRO in each geographic area previously designated by HHS as an area to be served by a PRO. HHS was given broad discretion to negotiate these contracts and could negotiate different agreements with each PRO depending on the type of activities that each PRO was expected to review. The 1982 Act also required hospitals, in order to participate in the Medicare program and be eligible for reimbursements, to enter into contracts with the PRO designated by HHS in their area.

Plaintiffs challenged, *inter alia,* a series of directives and transmittals issued by HHS governing the PRO program. The first, PRO Manual IM85–2, described an enforcement strategy for the PROS. PRO Manual IM85–2 required that the PRO review at least 5% of all hospital admissions selected at random, required that the PRO review all hospital admissions occurring within seven days of discharge, barred PROs from delegating certain activities unless provided for in the PRO contract, and contained a variety of rules about notice to hospitals and parties, the timing of PRO review, and jurisdictional disputes between hospitals in separate PRO-covered areas. Finding these regulations to be merely "an enforcement plan for HHS' agents in monitoring the quality of and necessity for various operations" and "establish[ing] a frequency and focus of PRO review," the court found these requirements of this directive to be classic "procedural rules," exempt from notice and comment rulemaking. *Id.* at 1050. At minimum, this manual burdened hospitals by "making it more likely that their transgressions from Medicare's standards will not go unnoticed and ... imposing on them the incidental inconveniences of complying with an enforcement scheme." *Id.* at 1051.

The court reached the same conclusion with respect to a second manual, PRO Manual IM85–3, which set forth "an enforcement plan for PROs to review hospital determinations that patients are no longer covered by Medicare and thus may be billed for its services." *Id.* Because this manual "neither change[d] the standard of PRO review, nor impose[d] anything greater than incidental mechanical burdens on regulated hospitals," it fell within HHS' discretionary enforcement authority, and thus was a "procedural rule" exempt from notice and comment rulemaking. *Id.*

The Court made an identical finding with respect to PRO Program Directive No. 2, which gave PROs directions regarding

---

dum opinion of February 6, 1990, this merely begs the question of whether defendants' actions are lawful. *See* Mem.Op., at 11 n. 26.

what information must be included in their agreements with hospitals. Characterizing this directive as "merely sculpt[ing] the enforcement activities of the PROs, choosing within the vast terrain of legitimate review activity specific pockets of hospital activity and behavior for more consistent scrutiny," the Court held that it imposed no new substantive burdens on hospitals. *Id.* at 1052.

*American Hospital Ass'n* specifically found that the relevant point of reference was the effect of the directives not on the PROs, but rather on the hospitals and health care providers. This was because the court found a PRO to be essentially an enforcement agent of the federal government, hired pursuant to a contract with the government. Its rights were therefore contractual, stemming from its agreement with HHS to monitor the compliance of the private hospitals with HHS' strictures. Were the government to seek to restructure the PRO's obligations after the inception of the contractual relationship, the PRO could validly claim a breach of its contract. Accordingly, the Court found irrelevant the question of whether an HHS directive burdened a PRO. "To hold otherwise would be to reach the curious result that, despite Congress' expressed desire that HHS utilize private review outfits, HHS cannot reach through its contracting agents the same result it could surely reach itself by using its own employees as enforcement agents." *Id.* at 1049.

Defendants seek to analogize the coinsuring lenders here to the PROs in *American Hospital Ass'n*, arguing that relationship between the lenders and HUD is purely contractual. Defendants maintain that the relevant point of reference here is the effect of the Lender Letters on the puta-tive borrowers. Because, according to defendants, the Letters do not impinge on any rights or interests of the putative borrowers, they are mere "procedural rules." Defendants also characterize the 45 business day delay in processing loan applications created by the Letters as merely a "derivative burden" and "incidental inconvenience."

The Court finds defendants' argument unpersuasive. As plaintiffs argue, their relationship with HUD is not contractual but of regulatory origin. Furthermore, the burdens placed on them by defendants' actions are more than an "incidental inconvenience." Despite defendants' insistence to the contrary, the Court finds that neither the type of relationship between plaintiffs and defendants nor the effect of the defendants' actions upon the plaintiffs in the instant case are analogous to those of *American Hospital Ass'n*. The Court's conclusion has not changed since the issuance of the previous memorandum opinion, i.e., "by mandating previously unrequired pre-commitment review ... and preventing previously entered commitments from proceeding to closing until HUD issues a written finding that the commitments are 'legally binding,' ... the Letters ... create substantive rules which vastly change the standard operating procedures of the coinsurance program." [12] Accordingly, they are subject to notice and comment rulemaking pursuant to 5 U.S.C. § 553.[13]

## 2. De Facto Probation

■ In Count III, plaintiffs allege that defendants' actions have placed them on *de facto* probation in violation of HUD's own procedures for disciplinary action. Al-

---

**12.** Mem.Op., at 11.

**13.** Although the parties placed less emphasis, both in their pleadings and at oral argument, on plaintiffs' allegation in Count II, that defendants violated 42 U.S.C. § 3535(*o*), plaintiffs have also demonstrated a likelihood of success on the merits of this claim. This section requires HUD to submit not only proposed final rules to Congress before their effective date, but "all rules or regulations which are under development." 42 U.S.C. § 3535(*o*)(2)(A, B). Defendants argue that the scope of § 3535(*o*) is coextensive with the scope of the APA's notice and comment requirements and therefore has no application to the lender letters at issue here, because those letters are "rules of procedure" exempt from the notice and comment requirements of 5 U.S.C. § 553. Even assuming the correctness of defendants' premise, their conclusion is flawed, because, as previously explained, the lender letters are *not* exempt from notice and comment rulemaking.

though plaintiffs do not enjoy the same degree of autonomy that existed prior to the issuance of the Coinsuring Lender Letters, they have not been suspended from their operations. Plaintiffs have not been singled out nor treated differently than every other coinsuring lender participating in the coinsurance program. Their authority to issue commitments has not been revoked. Rather, HUD has imposed additional and substantial requirements in an effort to curb what it sees as systematic problems in the coinsurance program. Accordingly, the Court rejects plaintiffs' argument that the effect of defendants' actions has been to place plaintiffs on *de facto* probation.

### B. *Irreparable Injury*

■ In order to establish irreparable injury justifying preliminary injunctive relief, a plaintiff must establish injury that is certain, great, and actual, not theoretical. *See Wisconsin Gas Co. v. Federal Energy Regulatory Commission*, 758 F.2d 669, 674 (D.C.Cir.1985). The injury must be imminent, creating a "clear and present" need for equitable relief to prevent irreparable harm. *Id.* (quoting *Ashland Oil, Inc. v. Federal Trade Commission*, 409 F.Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir.1976)). Mere economic loss, in and of itself, does not constitute irreparable harm. *Id.* "Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Id.*

■ Furthermore, the movant must establish that the irreparable injury is likely to occur. The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future. *Id.* Finally, the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin. *Id.*

■ Plaintiffs have satisfied their burden here. The first affidavit of John Laird explains that Centennial is at the present time unable to close approximately $20 million of existing coinsured loans as a result of HUD's recent actions. Members of the Housing Study Group are unable to close an additional $108 million of existing coinsured loans. Centennial is not able to take action on applications for an additional $66 million in loans and the hands of the Housing Study Group's members are tied in the same manner with respect to applications for $442 million in loans that would otherwise be processed.[14] As a result of Coinsuring Lender Letters Nos. 90–1 and 90–2, Centennial has been unable to generate new business and funds, has been forced to reduce its work force, and expects to lose further employees which will eventually force it out of business.[15] Similarly, ABG has been forced to lay off workers, close down its branch office in Richmond, Virginia, and reduce salaries.[16] ABG anticipates having to make further layoffs and cutbacks, creating a serious risk of going out of business.[17] Approved coinsuring lenders, including ABG and Centennial, have made substantial investments in capital and human resources based on HUD's previous representations of continued commitment to the coinsurance program. With the addition of a precommitment review period of 45 *business* days, project developers, owners, and borrowers are and will continue to be reluctant to submit applications to approved coinsuring lenders, creating adverse economic impacts upon these lenders.

The moratorium on the funding of retirement service centers mandated by Coinsuring Lender Letter No. 89–12 is also causing irreparable injury. Prior to the issuance of this letter, ABG and other Housing Study Group members were accepting and processing applications for financing retirement service centers.[18] Letter No. 89–12 suspended action on those applications.

---

14. First Laird Aff., ¶¶ 43–46.

15. Second Laird Aff., ¶¶ 28–33.

16. Gardiner Aff., ¶ 45.

17. *Id.* ¶¶ 62–63.

18. *Id.* ¶ 59.

Also telling is a HUD internal memorandum entitled "Coinsurance Exit Visas," dated January 24, 1990, which recognizes the impact of HUD's recent actions on plaintiffs and predicts that as a result of those actions, some defaults in virtually every coinsuring lender's portfolio and "crashes" in the lenders' businesses will occur.[19]

In sum, the effects of defendants' actions are not speculative, imagined, or insubstantial. Rather, the injury to plaintiffs is substantial, imminent, directly related to defendants' actions, and irreparable beyond mere recoverable monetary loss.

### C.  Effects on Third Parties and the Public Interest

Although modifications of the coinsurance program may well be needed and justified, the public interest is best served by ensuring that agencies effectuate their proposed courses of action consistent with Congressional mandate.  Should HUD determine, as it appears to have done, that the public is not being served by the continuation of the program, it would certainly be well within its delegated authority as an executive agency to seek to terminate the program.  In so doing, it must however comply with the applicable notice and comment requirements of the APA and the Congressional layover and wait provisions of the Department of Housing and Urban Development Act.

### D.  HUD's Decision to Terminate the Coinsurance Program

Count IV of plaintiffs' complaint alleges that "[t]he decision of the Secretary to end the coinsurance program lacks rational foundation and is unsupported by substantial evidence" and as such, "is arbitrary and capricious in violation of section 10 of the APA, 5 U.S.C. § 706."  Complaint, ¶¶ 94–95.  Defendants have moved to dismiss this count, contending that it is not ripe for review.  The Court agrees.

As the Supreme Court stated over two decades ago, the basic rationale of the ripeness doctrine is

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).  Two factors are used to evaluate ripeness: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Id.* at 149, 87 S.Ct. at 1515.  Where a complaining party has not suffered any injury, or the injury is speculative, dismissal is appropriate.  *See Socialist Labor Party v. Gilligan,* 406 U.S. 583, 589, 92 S.Ct. 1716, 1720, 32 L.Ed.2d 317 (1972).

■ Furthermore, when a party challenges action by an agency, that action must be sufficiently final to be felt in an immediate, direct and concrete way to a complaining party.  *See Abbott Laboratories,* 387 U.S. at 148–49, 87 S.Ct. at 1515; *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 162–65, 87 S.Ct. 1520, 1523–25, 18 L.Ed.2d 697 (1967).  The concept of ripeness is imposed to assure that the issues are fit for judicial resolution, i.e., the questions are essentially legal rather than factual in nature, and the challenged agency action is *sufficiently final* to assure that a real controversy exists.  *Peter Kiewit & Sons' Co. v. United States Army Corps of Engineers,* 714 F.2d 163, 168 (D.C.Cir.1983) (emphasis in original) (citation omitted).

■ Agency action which merely initiates proceedings has no legal force, is not a definitive statement of position, and therefore is not final agency action ripe for review.  *Federal Trade Commission v. Standard Oil Co. of California,* 449 U.S.

---

**19.** Plaintiffs' Exhibit F.  Although defendants maintain that this memorandum does not reflect the official HUD position, it nevertheless buttresses the assertions presented in the Laird, Gardiner, and Chuvala affidavits.

232, 241–43, 101 S.Ct. 488, 493–94, 66 L.Ed.2d 416 (1980).

■ The actions taken by defendants in January 1990 about which plaintiffs complain, i.e., Coinsuring Lender Letters Nos. 90–1 and 90–2 and News Release No. 90–09, do not terminate the coinsurance program. Rather, they establish a precommitment review process requiring coinsuring lenders to obtain HUD authorization before making further loan commitments. Defendants have repeatedly represented, both before and after the filing of the instant lawsuit, that they will proceed with notice and comment rulemaking in determining whether and how to end the coinsurance program. At this point, however, that process has not yet begun. No regulations, proposed or otherwise, have been published which will abolish coinsurance. Although Secretary Kemp has announced his intention to terminate the coinsurance program, News Release No. 90–09, at 3, defendants have not actually commenced, much less completed, rulemaking proceedings to execute this intention. Under these circumstances, where HUD has not formally proposed a course of action terminating the coinsurance program, Count IV of plaintiffs' complaint is premature and shall be dismissed.[20]

### E. *Disqualification of Secretary Kemp and Other HUD Officials*

In Count V of their complaint, plaintiffs allege that Secretary Kemp is biased and incapable of proceeding as an impartial decisionmaker.[21] Defendants have moved to dismiss this count for failure to state a claim, asserting that plaintiffs have failed to allege sufficient facts to meet the high standard required for disqualification of an agency official in informal rulemaking proceedings. The Court agrees with defendants and accordingly dismisses Count V.

■ "An administrative official is presumed to be objective and 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1208 (D.C.Cir.1980) (quoting *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)). Mere proof that the official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute cannot overcome that presumption. *Id.*

The standard for disqualifying an agency official from participating in rulemaking proceedings is substantial. Plaintiffs must establish by clear and convincing evidence that Secretary Kemp has an unalterably closed mind on matters critical to the disposition of the proceeding. *See Association of National Advertisers v. Federal Trade Commission*, 627 F.2d 1151, 1170 (D.C.Cir. 1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). Furthermore, in reviewing plaintiffs' claim, Secretary Kemp's statements must be considered as a whole. *See id.* "The mere discussion of policy or advocacy on a legal question, however, is not sufficient to disqualify an administrator." *Id.* at 1171. In

---

**20.** In their "Second Notice of Filing," plaintiffs advised the Court that C. Austin Fitts, Assistant Secretary for Housing and the FHA Commissioner, stated before the Subcommittee on VA, HUD and Independent Agencies of the House Committee on Appropriations that HUD had "halted further insurance activity under the multifamily Coinsurance program." Defendants advised the Court, however, that the document submitted by plaintiffs which contained this statement was only a draft statement. In her actual statement presented to the Subcommittee, Fitts advised that HUD had *"proposed* eliminating the coinsurance method of distributing multifamily insurance." Response to Plaintiffs' Second Notice of Filing, Attachment A, p. 1 (emphasis added).

**21.** At the initial conference in this action, plaintiffs advised the Court that they sought to disqualify not only Secretary Kemp, but those of his employees, officers, and agents who share his pre-decisional bias. Apparently, plaintiffs have abandoned their attempt to disqualify persons other than Secretary Kemp and have explicitly stated that they do not seek to disqualify the Commissioner of Federal Housing. *See* Reply Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction and Opposition to Defendants' Motion to Dismiss, p. 37 n. 4.

the instant case, plaintiffs have failed to meet this stringent standard.

■ In support of their allegation of predecisional bias, plaintiffs point to the comments made by Secretary Kemp as reflected in News Release No. 90–09, issued January 17, 1990. That Release, captioned "Kemp Announces Restructuring of Full Insurance Program for Multifamily Housing; Coinsurance to End," states,

> Secretary of Housing and Urban Development Jack Kemp today announced his decision to restructure HUD's long-standing program of providing full, federal insurance for loans made to construct and rehabilitate market-rate, multifamily housing....
>
> As part of the restructuring, Kemp also announced his intention to stop distributing mortgage insurance through "coinsurance," which was administratively established in 1983....
>
> ... A careful and prolonged examination of all the available options and the potential consequences of each to the American public has led to the prudent management decision to end coinsurance and rededicate the Department to an enhanced program of full insurance.

Complaint, Exhibit B.

These statements, made before the commencement of any rulemaking proceedings, when considered together with the remainder of the News Release and other statements made by Secretary Kemp, do not establish, by clear and convincing evidence, an "unalterably closed mind." As our court of appeals stated in *Association of National Advertisers, Inc.*, 627 F.2d at 1173:

> This court has never suggested that interchange between rulemaker and the public should be limited prior to the initiation of agency action. The period before the Commission first decides to take action on a perceived problem is, in fact, the best time for a rulemaker to engage in dialogue with concerned citizens. Discussion would be futile, of course, if the administrator could not test his own views on different audiences. Moreover, ... an expression of opinion prior to the issuance of a proposed rulemaking does not, without more, show that an agency member cannot maintain an open mind during the hearing stage of the proceeding.

Secretary Kemp's statements are certainly no more indicative of predecisional bias than the statements in *Consumers Union of the United States v. Federal Trade Commission*, 801 F.2d 417 (D.C.Cir.1986), which were found not to satisfy the *Association of National Advertisers* test. There, plaintiff challenged, *inter alia*, the impartiality of James Miller, then Chairman of the FTC, in a rulemaking proceeding. Miller had expressed his preference for one proposed rule over another prior to the rulemaking process and had predicted, after the publication of the proposed rule but before the close of the comment period, that a certain provision which he viewed as unnecessary would not be adopted by the Commission. The court, applying the *Association of National Advertisers* test, found that neither statement constituted "clear and convincing evidence" that Miller had "an unalterably closed mind on matters critical to the disposition of the proceeding," concluding instead that neither statement demonstrated that Miller's view could not be changed by the ensuing rulemaking proceedings. *Id.* at 427.

Likewise, Secretary Kemp's statements, made prior to the initiation of any rulemaking proceedings, do not establish that his announced intention to terminate the coinsurance program is set in stone. Rather, they are properly seen as part of an evolving and ongoing dialogue between HUD and the coinsuring lender industry meant to encourage comments from those persons or entities both opposed to and in favor of, his proposed action. In order to intelligently perform his duties by making informed decisions, Secretary Kemp has made his intention known so that interested parties can contribute to the debate. Such action does not require disqualification.

Because plaintiffs have failed to satisfy the stringent standard of *Association of*

*National Advertisers,* defendants' motion to dismiss Count V shall be granted.[22]

### F. *Plaintiffs' Second Motion for a Temporary Restraining Order*

▮ Defendants advised the Court on March 6, 1990, the day before the hearing on plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss, that because HUD was concerned about the outcome of that hearing, it had issued a new interim rule governing precommitment review for lenders participating in the coinsurance program and had transmitted it to the appropriate committees of the House and Senate pursuant to 42 U.S.C. § 3535(*o*).[23] After the expiration of its layover and wait period, HUD published the Interim Rule in the Federal Register on March 27, 1990. 55 Fed.Reg. 11,342. The Rule is to become effective on April 26, 1990. The stated purpose of the Rule was "to afford urgently needed additional protection for the General Fund against excessive defaults in the coinsurance program." *Id.* The Interim Rule incorporated the precommitment approval requirements of the Lender Letters at issue in plaintiffs' complaint.

On April 20, 1990, plaintiffs filed a second motion for temporary restraining order, seeking to enjoin defendants from enforcing and giving effect to this Interim Rule before conducting notice and comment proceedings as required by 5 U.S.C. § 553 and 42 U.S.C. § 3535(*o*). Plaintiffs argue that HUD lacked good cause for dispensing with notice and comment prior to promulgating the Interim Final Rule.

Contrary to plaintiffs' assertion, public comment was urged and invited. 55 Fed. Reg. 11345. However, HUD reduced the public comment period to 30 days because it "want[ed] to act quickly to make adjustments in the final rule, if necessary, to ensure that the precommitment review process functions smoothly and appropriately." *Id.* HUD was concerned that if the

rule were not issued for effect on an interim basis, "it would predictably require at least an additional three months for the rule to complete its public comment period, be republished as a final rule, and become effective" and that this "additional delay could cause HUD the needless loss of millions of dollars." 55 Fed.Reg. 11345. Thus, it is apparently the abbreviation of the notice and comment period to which plaintiffs object.

In order to prevail on their second motion for a temporary restraining order, plaintiffs must satisfy the four-part test of *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977); *accord, Virginia Petroleum Jobbers Ass'n v. Federal Power Commission,* 259 F.2d 921, 925 (D.C.Cir.1958): (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that no other parties will be harmed if temporary relief is granted; and (4) that the public interest favors entry of a temporary restraining order.

Plaintiffs have satisfied the first element of this test. Plaintiffs maintain that HUD's asserted justification for the emergency measure of issuing the Interim Rule without full notice and comment proceedings—that the coinsurance program has sustained $960 million in losses accompanied by an alarming rate of defaults in recent months and severe losses to the FHA General Insurance Fund—is misleading and exaggerated. In support of their position, plaintiffs offer the Second Affidavit of Stephen H. Gardiner, President of ABG Financial Services, Inc. and Chairman of the Housing Study Group ("Second Gardiner Aff."), who explains that the FHA General Insurance Fund would not be endangered were HUD to conduct full notice and comment proceedings prior to implementing interim measures regarding the coinsurance program. Gardiner asserts

---

**22.** Having granted defendants' motion to dismiss Counts IV and V, defendants' motion for a protective order staying discovery with respect to Counts IV and V of the complaint is denied as moot.

**23.** *See* Declaration of Grady J. Norris; *see also* n. 2, *supra.*

that the losses cited by HUD are overstated and that those losses that have occurred are long-standing matters in the coinsurance industry that HUD has been studying since September 1988 when GNMA defaulted DRG Funding and seized its billion dollar portfolio.[24] In addition, Gardiner states that HUD has neglected to take account of the roughly $169 million for the Fund through the collection of Mortgage Insurance Premiums [25] and that the majority of the defaults have been caused by lenders whose authority as approved coinsuring lenders has been withdrawn or suspended by HUD. Gardiner also disputes the accuracy of the $960 million dollar figure contained in the Interim Rule, stating that the losses to the FHA General Insurance Fund are far smaller than HUD's assessment because the defaults that have occurred in the coinsurance program do not necessarily translate into actual losses to the General Insurance Fund.[26]

HUD takes issue with plaintiffs' contention that the losses to the Fund are overstated. More importantly, however, HUD states that the past losses to the Fund was not the principal basis for HUD's decision to issue the Interim Final Rule. Rather, HUD claims that the principal reason for the issuance of the Rule was the need to prevent future losses, a laudable purpose. Notwithstanding these arguments, defendants have not shown sufficient reason to stifle the public's entitlement to full illumination and vigorous discourse provided through the normal notice and comment period required for all substantive rules of an agency. HUD has been studying this problem for more than one and one-half years but no emergency action has appeared necessary to HUD until now. It is therefore difficult to comprehend HUD's present insistence that irreparable injury

will occur were it required to afford the public the standard opportunity for notice and comment. As recently as April 2, 1990, the Senate Committee on Banking, Housing, and Urban Affairs expressed concern that HUD's recent actions threaten to nation's ability to deliver low and moderate income multifamily housing as it is the only housing delivery system currently in place.[27] After considered opportunity to develop and inform the issue, it may be determined that HUD would be justified in the sweeping and substantive changes it seeks to immediately effectuate. These changes may be necessary and appropriate to remedy the current difficulties and would then be in the public interest. But it can only be a well reasoned and informed decision if it is reached through the safeguard procedures established by law to ensure that result, namely, the notice and comment requirements of the APA. Because the Interim Rule is a substantive rule, full notice and comment is required.

For the same reasons stated earlier in connection with plaintiffs' original motion for a preliminary injunction against the enforcement of the coinsuring lender letters, the Court finds that plaintiffs have satisfied the other three elements required for the entry of a temporary restraining order against the enforcement of the Interim Rule—irreparable injury will occur in the absence of the requested relief; no other parties will be harmed if temporary relief is granted; and the public interest will be served by granting the requested relief.[28]

HUD adamantly asserts that it is faced with defaults in the coinsurance program which are rapidly growing in number and size. Without endorsing this position, the Court will nonetheless set a prompt briefing schedule and final hearing on this matter in order to reach a speedy resolution of these matters.[29]

24. Second Gardiner Aff., ¶¶ 4, 17.

25. *Id.* ¶¶ 24–26.

26. *Id.* ¶¶ 6–15.

27. Memorandum of *Points and Authorities in Support of Plaintiffs' Second Motion for a Temporary Restraining Order and Second Motion for a Preliminary Injunction*, Exhibit 2, p. 1.

28. *See,* Discussion, *supra,* parts B and C.

29. It is worth noting, however, that had HUD complied with the notice and comment requirements of the APA from the outset rather than issuing the coinsuring lender letters and the interim final rule, the precommitment approval requirements which it now so desperately seeks

### G. *Plaintiffs' Motion to Compel Discovery/Defendants' Motion for a Protective Order*

Plaintiffs have served defendants with one Interrogatory and one Request to Produce aimed at discovering the information underlying defendants' Interim Final Rule. The Request to Produce sought the administrative record underlying the Interim Rule; the Interrogatory sought information pertaining to defaults, losses, and claims under the coinsurance program. On April 19, 1990, plaintiffs filed a motion for an order compelling defendants to respond to these items on an expedited basis. Because the basis underlying HUD's decision to issue the Interim Rule on an emergency basis with abbreviated notice and comment is at issue here, defendants shall be required to promptly produce the administrative record supporting that decision. The administrative record alone should be sufficient to provide plaintiffs with the information they seek. Accordingly, defendants shall not be required to answer plaintiffs' Interrogatory.

### III.

For the above reasons, it is accordingly hereby

ORDERED that plaintiffs' motion for a preliminary injunction is granted and the Secretary of Housing and Urban Development, the Federal Housing Commissioner, and the Deputy Federal Housing Commissioner, their officers, agents, and employees, are preliminarily enjoined, until further order on the application for permanent injunction, from giving any further force or effect to Department of Housing and Urban Development Coinsuring Lender Letters Nos. 89–12, 90–1, or 90–2 other than by the notice and comment procedures prescribed in section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, and those procedures specified in section 7 of the Department of Housing and Urban Development Act, 42 U.S.C. § 3535(*o*). It is

FURTHER ORDERED that defendants' motion to dismiss Count IV of plaintiffs' complaint as premature and not ripe for review is granted and Count IV is dismissed without prejudice. It is

FURTHER ORDERED that defendants' motion to dismiss Count V of plaintiffs' complaint for failure to state a claim is granted. It is

FURTHER ORDERED that defendants' motion for a protective order staying discovery with respect to Counts IV and V of the complaint is denied as moot. It is

FURTHER ORDERED that on or before May 4, 1990 at 12:00 noon, plaintiffs shall supplement the record with any additional materials, including argument, so that the Court is able to reach a final decision on the merits of Counts I and II of plaintiffs' complaint. Defendants shall file their response to plaintiffs' submission on or before May 8, 1990 at 12:00 noon. It is

FURTHER ORDERED that plaintiffs' second motion for a temporary restraining order is granted and the Secretary of Housing and Urban Development, the Federal Housing Commissioner, and the Deputy Federal Housing Commissioner, their officers, agents, and employees, are hereby restrained and enjoined through May 4, 1990 at 8:20 p.m. from giving effect to the Interim Final Rule previously published at 55 Fed.Reg. 11,342 (March 27, 1990). No bond is required. If appropriate, the Court may, *sua sponte*, extend the effect of this temporary restraining order for an additional ten days so as to allow the parties to complete the final briefing and afford the Court time for a final hearing on the relief sought by plaintiffs. It is

FURTHER ORDERED that plaintiffs' motion to compel discovery is granted in part and defendants' motion for a protective order is granted in part and defendants are ordered to produce and hand-serve upon plaintiffs on or before May 2, 1990 a copy of the full agency record underlying the Interim Final Rule published in 55 Fed. Reg. 11,342 (March 27, 1990). Defendants shall not be required to respond to plaintiffs' Interrogatory. It is

to put into emergency placement could well

have become effective by this time.

FURTHER ORDERED that on or before May 4, 1990 at 12:00 noon, plaintiffs shall supplement the memorandum in support of their second motion for a preliminary injunction with any additional materials, including argument, so that their second motion for a preliminary injunction may be treated as a motion for permanent injunction. Defendants shall file their opposition to that motion on or before May 8, 1990 at 12:00 noon. There shall be no reply brief filed. It is

FURTHER ORDERED that there shall be a final hearing on the relief sought in plaintiffs' complaint and on plaintiffs' motion to permanently enjoin the enforcement of the Interim Final Rule published at 55 Fed.Reg. 11,342 (March 27, 1990) on May 11, 1990 at 1:30 p.m.

Should these rulings be appealed, no stay is warranted for the reasons recited in this Memorandum Opinion.