**HOUSING STUDY GROUP, et al., Plaintiffs,**

v.

**Jack F. KEMP, Secretary of Housing and Urban Development, et al., Defendants.**

**Civ. A. No. 89–0244.**

United States District Court, District of Columbia.

Feb. 6, 1990.

---

Robert C. Seldon, John E. Vigstadt, Joseph A. Kijewski, Krooth & Altman, Washington, D.C., for plaintiffs.

Mark Nagle, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiffs ABG Financial Services, Inc. ("ABG") and Centennial Mortgage, Inc., ("Centennial"), two active mortgage bankers approved by the United States Department of Housing and Urban Development ("HUD") to be Federal Housing Administration ("FHA") coinsuring lenders with authority to provide financing and issue mortgage insurance for qualified multifamily housing projects, and Housing Study Group, a trade association of which ABG and Centennial are members, bring this suit for declaratory and injunctive relief against Jack Kemp, Secretary of HUD ("Secretary"), C. Austin Fitts, Federal Housing Commissioner ("Commissioner"), and Peter H. Monroe, Deputy Federal Housing Commissioner seeking to enjoin defendants from interfering with the operation of the coinsurance programs established under Section 244 of the National Housing Act, as amended, 12 U.S.C. § 1715z–9.

The parties appeared before the Court this date for a hearing on plaintiffs' motion for a temporary restraining order. For the following reasons, the motion is denied.

### I.

The National Housing Act, originally promulgated in 1934, and amended on numerous occasions since then, 12 U.S.C. § 1701, *et seq.*, has as one of its primary purposes the promotion of the construction and availability of low and moderate income housing. Included in the original legislation was the creation of the Federal Housing Administration ("FHA"), to serve as one of the agencies charged with primary responsibility for the effectuation of the Act's purposes.[1]

The principal objectives of the National Housing Act carried out by the FHA are providing an adequate home financing sys-

---

1. 48 Stat. 1246 (formerly 12 U.S.C. § 1702).

tem by insurance of housing mortgages and credit and exerting a stabilizing influence on the mortgages market.[2] The FHA does not make loans itself; rather, it operates programs to insure private lenders against loss on mortgage loans used to finance the construction, rehabilitation, and improvement of eligible projects, which include single and multifamily residential properties, mixed use commercial and residential projects, land development projects, and group practice and other health care facilities.[3]

In order to execute each of these programs, Congress authorized the Secretary of HUD to insure the mortgage loans by which eligible projects were acquired, refinanced, constructed, or rehabilitated.[4] At this time, the FHA itself fully insured eligible mortgage loans on section 221(d), 223(f), and 232 programs. Comprehensive regulations were utilized by the FHA in administering the full insurance program.[5]

In 1974, Congress vastly altered this insurance scheme by promulgating section 244 of the National Housing Act which authorized the Secretary to implement the coinsurance program. 12 U.S.C. § 1715z–9. Section 244 provides, in relevant part:

> [T]he Secretary, upon request of any mortgagee and for such mortgage insurance premium as he may prescribe ... may insure and make a commitment to insure under any provision of this chapter any mortgage ... otherwise eligible ... pursuant to a co-insurance contract providing that the mortgagee will—(1) assume a percentage of any loss on the insured mortgage ... and (2) carry out ... [such] functions as the Secretary, pursuant to regulations, shall approve as consistent with the purposes of this chapter.

*Id.*[6]

Two features of the coinsurance program are of particular importance here. The first is the sharing of risk of loss between the FHA and the coinsuring lender in the event of a default on a coinsured mortgage loan. The second is the authority and autonomy of approved coinsuring lenders to process applications for coinsured mortgage loans and to make commitments for such loans for eligible projects.[7]

In response to the authority delegated by Congress to promulgate rules and regulations necessary to carry out his functions, including administering the coinsurance program,[8] the Secretary issued regulations implementing the coinsurance program pursuant to notice and comment rulemaking as required by the Administrative Procedure Act, 5 U.S.C. § 553. These regulations are currently codified in 24 C.F.R. Parts 251, 252, and 255.

Since the creation of the coinsurance program, HUD, the Commissioner, and other government officials have commented on the success of the program.[9] Despite this

---

**2.** 24 C.F.R. § 200.3.

**3.** 24 C.F.R. § 200.5. Pertinent to the instant action are the following three programs under the National Housing Act. The first is the section 221(d) program, which "is designed to assist private industry in providing housing for low and moderate income families and displaced families" through the construction and substantial rehabilitation of multifamily rental housing complexes and retirement service centers. 12 U.S.C. § 1715*l*(a). The second is the section 223(f) program, which promotes the acquisition, refinancing, and repair of existing multifamily complexes. 12 U.S.C. § 1715n. The third is the section 232 program, focusing on promoting construction and substantial rehabilitation of nursing homes, intermediate care facilities, and board and care homes, as well as the acquisition or refinancing of such facilities as they already exist. 12 U.S.C. § 1715w.

**4.** 12 U.S.C. §§ 1713, 1715*l*(b), 1715n(b), and 1715w(d).

**5.** 24 C.F.R. Part 207, *et seq.*

**6.** Otherwise eligible mortgages included loans for the section 221(d), 223(f), and 232 programs.

**7.** The Senate Report on section 244 noted that by having approved lenders process the loans, there would be a reduction in the long delays before approval which had in the past tended to discourage participation in FHA programs. *See* S.Rep. No. 93–693, at 16, *reprinted in* 1974 U.S. Code Cong. & Admin.News 4273, 4288.

**8.** 42 U.S.C. § 3535(d).

**9.** In his recent testimony on September 28, 1989 before the Senate Committee on Banking, Housing, and Urban Affairs, Deputy Commissioner

apparent success, the reputation of the co-insurance program was seriously damaged on September 16, 1988, when the Government National Mortgage Association ("GNMA") declared DRG Funding Corporation ("DRG"), the largest coinsuring lender, in default on its obligations.[10] GNMA seized DRG's portfolio, effectively removing DRG's authority to serve as a coinsuring lender. On March 22, 1989, HUD suspended DRG from participating in any federal program or HUD procurement contract.[11]

Secretary Kemp testified before the Subcommittee on Employment and Housing of the House Committee on Government Operations on July 11, 1989 and acknowledged that HUD was responsible for the situation which led to DRG's default:

> It has become clear that HUD's monitoring and enforcement of the multifamily coinsurance program has been substandard and inexcusable. In December of last year, the Inspector General reported serious problems with the underwriting practices of DRG, HUD's largest coinsurer, with a portfolio of over $1.4 billion in approved loans. In March, I suspended DRG from doing business with the Department. My action was essential. DRG defaults had equalled $500 million, and they had earlier been suspended by GNMA. There is no excuse that this action was not taken sooner.[12]

The following day, the Secretary gave the same testimony to the House Committee on Banking, Finance, and Urban Affairs.[13]

Since the date DRG was suspended until January 1, 1990, HUD placed four other approved coinsuring lenders on probation and suspended the authority of six others.[14] None of these coinsuring lenders is a member of the Housing Study Group or a party to this action.[15] As of January 1, 1990, approximately 44 coinsuring lenders retained their full approval from HUD.[16]

As a result of these occurrences, HUD found it appropriate to consider reforms to the coinsurance programs and industry as a whole. Plaintiff Housing Study Group asserts that it participated in this process by meeting repeatedly with HUD officials and providing testimony to Congressional Committees and Subcommittees. In addition, the Housing Study Group submitted written proposals for reform to HUD in February and May of 1989.

On May 5, 1989, HUD issued Coinsuring Lender Letter No. 89-4, which established a 120-day evaluation period for the coinsurance programs, increased monitoring of approved coinsuring lenders, and announced a moratorium on new lender approvals. Still, HUD noted that it was committed to the coinsurance programs as "a major vehicle to deliver the multifamily mortgage insurance program." [17]

In January, 1990, HUD took three specific actions, which according to plaintiffs "marked a dramatic departure from [HUD's] previous actions and statements," [18] and triggered the instant lawsuit. First, on January 16, 1990, the Commissioner issued Coinsuring Lender Letter No. 90-1, which required HUD reviews of all coinsurance mortgage applications prior to the issuance of any binding commit-

---

Peter Monroe acknowledged that "coinsurance has in recent years become FHA's principle vehicle for meeting" the FHA's "long-standing commitment" under the National Housing Act. Plaintiffs' Attachment 1, at 2. The Deputy Commissioner also noted that since 1983, close to 1500 projects with a total mortgage value of approximately $9.5 billion had been coinsured.

10. At that time, $538 million (nearly 50%) of DRG's mortgage loans were in default.

11. Affidavit of John M. Laird, Vice President and General Counsel for Centennial Mortgage, Inc. and Treasurer of the Housing Study Group ("Laird Aff."), ¶¶ 16–17.

12. Plaintiffs' Attachment 6, at 9.

13. Plaintiffs' Attachment 7, at 9.

14. Laird Aff., ¶ 19.

15. *Id.* ¶ 20.

16. *Id.* ¶ 21.

17. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction ("Memo. in Support"), Ex. D, at 1.

18. Memo. in Support, at 21.

ments and prohibited coinsuring lenders from issuing loan commitments before receiving written notification from HUD that it had "reviewed and found to be acceptable the underwriting and related loan commitment determinations made by the lender."[19] The Letter contained no standards by which the review would be conducted.

The following day, January 17, 1990, Secretary Kemp issued News Release No. 90–009, announcing his decision to end coinsurance. Declaring the program structurally flawed, fundamentally unsound, and administratively unfixable, Kemp stated that "[a] careful and prolonged examination of all the available options and the potential consequences of each to the American public has led to the prudent management decision to end coinsurance and rededicate the Department to an enhanced program of full insurance."[20] The News Release reiterated that all approved coinsuring lenders were required to submit "all potential loans to the Department for a full precommitment review of underwriting."[21]

On January 23, 1990, the Commissioner issued Coinsuring Letter No. 90–2, which advised coinsuring lenders that they could not issue binding mortgage loan commitments after January 16, 1990, unless they received approval from HUD and the appropriate field office.[22] Loan commitments issued before January 16, 1990 would not be honored unless HUD made a determination that the commitments were "legally binding."[23] Loan commitments issued between January 16, 1990 and January 23, 1990 would not be honored without written approval from HUD headquarters, which the Commissioner advised would take approximately 45 working days. Like Coinsuring Letter 90–1, no standards of review were set forth.

Plaintiffs filed the instant complaint on February 2, 1990, alleging that these actions constitute attempts to amend the co-

insurance regulations which were done without observing the rulemaking procedures required by Section 4 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, or the Congressional layover and wait provisions contained in HUD's enabling legislation. 42 § 3535(o).[24] In addition, plaintiffs contend that defendants actions are "arbitrary and capricious" in violation of section 10 of the APA, 5 U.S.C. § 706 in that "they were wholly and inexplicably inconsistent with repeated earlier and contemporaneous announcements by defendants and their delegates which declared HUD's commitment to the continuation of the coinsurance program." Finally, plaintiffs assert that in subjecting prospective loans of approved coinsurers to prior review and approval by HUD, defendants *de facto* placed coinsurers on probation, in violation of the coinsurance regulations and the due process clause of the Fifth Amendment.

## II.

At this stage of the proceedings, plaintiffs merely desire an order restraining defendants from promulgating further legislative rules without procedures required by law, i.e., the notice and comment rulemaking required by 5 U.S.C. § 553 and the Congressional layover and wait provisions contained in HUD's enabling legislation, 42 § 3535(o), or from taking further actions having the *de facto* effect of placing plaintiffs on probation from the coinsurance program.[25]

■ The showing required by a party seeking a temporary restraining order is well-established. A temporary restraining order may be granted only when the plaintiff demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that no other parties will be harmed if temporary relief is

---

**19.** *Id.* Exhibit A, at 1.

**20.** *Id.* Exhibit B, p. 1.

**21.** *Id.* at 3.

**22.** Memo. in Support, Exhibit C, at 1.

**23.** *Id.*

**24.** Complaint, ¶ 8.

**25.** *See* Memo. in Support, at 26.

granted; and (4) that the public interest favors entry of a temporary restraining order. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977); *accord, Virginia Petroleum Jobbers Ass'n v. Federal Power Commission,* 259 F.2d 921, 925 (D.C.Cir.1958).

### A. *Likelihood of Success on the Merits*

Plaintiffs argue that defendants have acted in violation of the law in three respects by issuing Coinsuring Lender Letters Nos. 90–1 and 90–2 and HUD News Release 90–09. First, these acts constituted promulgation of legislative rules which required notice and comment rulemaking pursuant to the APA, 5 U.S.C. § 553. Plaintiffs maintain that in this regard HUD also violated its own announced policy to provide for public participation in rulemaking even if not required by the APA. Second, by impairing plaintiffs' authority and autonomy as coinsuring lenders, defendants *de facto* placed plaintiffs on probation in violation of the Fifth Amendment. Third, defendants violated HUD's enabling legislation, 42 U.S.C. § 3535(*o*) which requires HUD to submit proposed regulatory action to Congress for its review prior to being formally proposed and effected.

■ The Court need only address the rulemaking claim at this stage of the proceedings, for it appears from the limited record that has been developed to this point that plaintiffs have a likelihood of success on the merits of this claim. Plaintiffs assert that by issuing the two Coinsuring Lender Letters and the Press Release, defendants amended the previous authority and autonomy of approved coinsuring lenders under the coinsurance regulations and therefore engaged in rulemaking, as defined by the APA and HUD's own regulations. *See* 5 U.S.C. § 551(4), (5); 24 C.F.R. § 10.2(a), (b). It is defendants' position that letters are not new legislative rules subject to notice and comment rulemaking. Rather, they assert that the letters constituted a proper exercise of authority already vested in HUD through regulations duly promulgated pursuant to the notice and comment rulemaking requirements of the APA. Thus, defendants argue, the effect of the letters is merely to "monitor" the activities of previously approved coinsuring lenders.

On its face, plaintiffs' rulemaking claim appears persuasive. The Coinsuring Lender Letters do more than create additional "monitoring" of coinsuring lenders. Rather, by mandating previously unrequired pre-commitment review by undefined standards and preventing previously entered commitments from proceeding to closing until HUD issues a written finding that the commitments are "legally binding," a term which is also undefined, the Letters appear to create substantive rules which vastly change the standard operating procedures of the coinsurance program.[26] If such, they would be subject to the rulemaking procedures of section 4 of the APA, 5 U.S.C. § 553 which require advance publication in the Federal Register of the proposed rule or its substance, an opportunity for public participation through submission of written comments, and publication of the final rule, incorporating a concise statement of its basis and purpose, thirty days before its effective date. *See Batterton v.*

---

**26.** The regulations upon which defendants rely as authority for their actions, 24 C.F.R. §§ 251.-1(a)(2), 251.102(b)(9) and 251.301(c) do not compel a different result. 24 C.F.R. § 251.1(a)(2) gives the Commissioner authority to modify, suspend, or discontinue coinsurance activities if he determines that coinsurance is disrupting or will disrupt the housing or mortgage market or is adversely impacting or will adversely impact other federally insured projects. The Commissioner has made no such finding in the instant case. 24 C.F.R. § 251.102(b)(9) requires an applicant lender to the coinsurance program to provide a statement agreeing to abide by all applicable requirements issued by the Commissioner for performing its functions. This merely begs the question of whether the actions in the instant case are lawful. Finally, 24 C.F.R. § 251.301(c), which requires a coinsuring lender to submit any information required by the Commissioner for tracking or monitoring purposes, is not necessarily applicable as it appears that defendants' actions constitute considerably more than "tracking" or "monitoring."

*Marshall*, 648 F.2d 694, 700 (D.C.Cir. 1980).[27]

Even were the Court to conclude upon further development of this litigation that these rules were not subject to the notice and comment requirements of the APA, it appears that defendants have violated HUD's own policy to "provide for public participation in rulemaking with respect to *all* HUD programs and functions ... even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1 (emphasis added).

In addition, plaintiffs have made a facially convincing showing that defendants have violated HUD's enabling legislation, specifically, the Congressional layover and wait provisions of 42 U.S.C. § 3535(*o*). That section requires HUD to transmit, semi-annually, "an agenda of *all* rules or regulations which are under development or review...." (emphasis added). No such rule or regulation may be published for notice and comment before it has been transmitted first to Congress for review over a specified period of time. In addition, no rule or regulation may become effective until after it has been in Congress for an additional period of time after it has been proposed by HUD as final. By drastically changing the coinsurance program through the issuance of Coinsuring Lender Letters Nos. 90–1 and 90–2, defendants have done what Congress specifically warned them from doing:

> The conferees strongly express objection to changing federal policy through notices, handbooks, and *mortgage letters* which may be initiated by the Departments themselves or OMB. Changes in federal policy should be exposed to the federal rulemaking process for public review and comment.

H.Conf.Rep. No. 100–426, at 241, *reprinted in* 1987 U.S.Code Cong. & Admin.News at 3317, 3538 (emphasis added).

### B. *Irreparable Injury*

Plaintiffs argue that defendants' actions last month have created turmoil and uncertainty in the industry which has and will continue to cause irreparable injury. Specifically, plaintiffs state that members of the Housing Study Group have approximately 15 projects, representing 2,702 units and $108,095,300 that cannot be closed due to Lender Letters Nos. 90–1 and 90–2.[28] In addition, there are approximately 61 projects, representing $442,411,100 and 10,383 units, for which applications and application fees have been collected but without firm commitments as of January 16, 1990. Due to the uncertainty, delay, and expense which accompanies precommitment review, plaintiffs contend half of these projects are in jeopardy of not being closed and funded.[29] Furthermore, at least two coinsuring lenders have already withdrawn completely from the coinsurance program and terminated substantially every employee in connection therewith.[30] It is averred, without specifics as to who they are, that other coinsurers are in the process of laying off up to 25% of their work forces.[31]

HUD itself recognized, as recently as November, 1989, that actions similar to the ones instituted in January, 1990, would affect the industry adversely. On November 22, 1989, HUD distributed among the members of the coinsurance industry and their trade associations, including plaintiff Housing Study Group, a working draft of an Interim Rule on Capital Requirements for approved coinsuring lenders, which would have increased these requirements. Although HUD decided to abandon this rule, it specifically noted that a moratorium on issuance of commitments would have disastrous economic impact on existing approved coinsuring lenders.[32]

---

27. Defendants have not argued, nor does it appear, that the exemptions to the notice and comment requirements of the APA, 5 U.S.C. § 553(b)(A) and (B), are applicable to the instant case.

28. *Id.* ¶ 44.

29. *Id.* ¶ 46.

30. *Id.* ¶ 50.

31. *Id.*

32. Specifically, the Interim Rule stated:

## C. *Effect on Third Parties and the Public Interest*

■ The public interest is best be served by requiring an agency to comply not only with the requirements of notice and comment provisions of the APA, but with that agency's own stated policies. At the same time, reforms in the coinsurance industry may be both necessary and highly appropriate to protect the public fisc as the recent experiences with DRG and other coinsuring lenders has demonstrated. Nevertheless, if such reforms are necessary, they must be effectuated in conformity with the procedures laid out by Congress. Both the APA and HUD's enabling legislation, which require public notice and comment prior to promulgation of substantive rules, seek to assure that such rules are not made in haste, but rather are the result of reasoned debate and full information. Furthermore, because the Deputy Commissioner himself has recently recognized that coinsurance is the "principle vehicle" by which the FHA fulfills its mission under the National Housing Act, third parties would best be served by requiring defendants to comply with the notice and comment requirements of the APA and HUD's own policies.

## D. *Requested Relief*

■ Despite plaintiffs' showing, the Court concludes that a temporary restraining order of the type sought by plaintiffs is not appropriate. At the hearing on their motion, plaintiffs made unambiguously clear that the relief they are seeking at this stage of the proceedings, that is, on their motion for a temporary restraining order, is to preserve the status quo. They are not requesting that Coinsuring Lender Letters Nos. 90–1 and 90–2 be declared invalid or that action taken pursuant to those letters be enjoined. They will seek that relief at

the preliminary injunction stage. At this point, however, they merely seek an order restraining and enjoining defendants from "otherwise impairing the authority and autonomy of approved coinsuring lenders, or failing to follow the coinsurance regulations, as codified in 24 C.F.R. Parts 251, 252, and 255." [33]

However, plaintiffs have not specifically identified any acts of defendants, either past, present, or future, which they wish to have enjoined. In effect, they are asking the Court to issue an order requiring defendants to act in accordance with applicable law and regulation. That defendants are required to comply with the law is self-evident. Therefore, although plaintiffs have, at least facially, satisfied two of the four elements required for a temporary restraining order, because they are not seeking to enjoin any specific present or past action of defendants nor any action which defendants are contemplating taking within the next ten days (the period which would be covered by a temporary restraining order), plaintiffs' motion must be denied.

### III.

For the reasons set forth above, it is accordingly hereby

ORDERED that plaintiffs' motion for a temporary restraining order is denied.

IT IS SO ORDERED.

---

The alternative to implementing the new capital and liquidity requirements through an interim rule would have been a moratorium on issuance of commitments until all the coinsurance reforms were in place following the normal rulemaking process (i.e., a proposed rule, followed by public comments and a final rule). The Department rejected this alternative because it would have (1) rendered coin-

sured financing unavailable for as long as eight months; and (2) *caused a severe adverse economic impact on existing approved coinsurance lenders.*
Plaintiffs' Attachment 10, at 7–8 (emphasis added).

**33.** Complaint, at 32, Prayer for Relief, B.