**JAYSON INVESTMENTS, INC., an Illinois corporation, as general partner of Michigan Beach Cooperative Partners Limited Partnership, an Illinois limited partnership; and Cincinnati Mortgage Corporation, a foreign corporation, Plaintiffs,**

v.

**Jack KEMP, Secretary of Housing and Urban Development; and Michigan Beach House Cooperative, an Illinois non-for-profit corporation, Defendants.**

No. 90 C 4004.

United States District Court, N.D. Illinois, E.D.

Sept. 18, 1990.

Jerome H. Torshen, Zoran Dragutinovich, Torshen, Schoenfield & Spreyer, Ltd., Chicago, Ill., for plaintiff Jayson Investments, Inc.

Bruce R. Meckler, Phelan, Pope & John, Chicago, Ill., Robert C. Seldon, Mario Greszes, Krooth & Altman, Washington, D.C., for plaintiff Cincinnati Mortg. Corp.

Ira H. Raphaelson, Acting U.S. Atty. by Nancy K. Needles, Asst. U.S. Atty., Chicago, Ill., Edward Eitches, Sr. Trial Atty., Washington, D.C., for defendant HUD.

Herbert H. Fisher, Chicago, Ill., for defendant Michigan Beach Housing Co-op.

## MEMORANDUM ORDER

BUA, District Judge.

Plaintiff Jayson Investments, Inc. ("Jayson") filed the instant action seeking to compel the Department of Housing and Urban Development ("HUD") to perform certain acts relating to the financing and operation of a particular real estate project in which Jayson has a substantial financial interest. First, Jayson seeks to compel HUD to issue its final endorsement of a mortgage securing a loan to Jayson for the development of cooperative housing at a building known as the Michigan Beach Apartments. HUD's final endorsement is required to trigger HUD's coinsurance of the mortgage. Second, Jayson seeks to require HUD to issue its approval of the conversion of the Michigan Beach project from cooperative housing to rental property. Under federal regulations, HUD's approval is required before such a conversion can take place.

In response to Jayson's allegations, HUD has filed a motion requesting the court to either dismiss the amended complaint or enter summary judgment in its favor. For the reasons stated herein, the court finds that based on certain material facts over which there is no genuine dispute, HUD is entitled to judgment as a matter of law. Therefore, HUD's motion is granted to the extent that it seeks the entry of summary judgment in its favor.

## FACTS

On May 24, 1985, the owner of the multi-family apartment building known as the Michigan Beach Apartments [1] filed a Chapter 11 petition in bankruptcy. *In Re Michigan Beach Apartments, An Illinois Limited Partnership*, 85 B 6614. HUD, the holder of the mortgage on the Michigan Beach property, was the sole secured creditor in the bankruptcy proceedings. At some point during the pendency of bankruptcy proceedings, Jayson became interested in purchasing Michigan Beach. Jayson, an Illinois corporation owned by brothers Scott and Jay Canel, was formed in 1986 to engage in the business of real estate investment.

Jayson claims it was solicited by HUD to buy the Michigan Beach property and develop it as a cooperative. HUD contends that developing the property into a cooperative was Jayson's own idea from the start. Whether the cooperative was initially HUD's idea or Jayson's, however, one thing is clear—HUD and Jayson reached an accord on a plan of reorganization for the property pursuant to which Jayson was to purchase the property and develop it as a cooperative. Under the terms of the initial agreement between HUD and Jayson, HUD's mortgage would be paid in full out of the proceeds of an FNMA Housing Cooperative Loan to be obtained by Jayson from the National Consumer Cooperative Bank. As a precondition to the release of the FNMA loan to Jayson, at least 50% of the Michigan Beach cooperative units had to be sold in advance.

On June 23, 1986, HUD filed its Plan of Reorganization in the bankruptcy court containing the specific details of its agreement with Jayson, including the terms outlined above. HUD also filed a Disclosure Statement with the bankruptcy court in which HUD stated its belief that "the best interests of all parties dictates that the Project be sold to Jayson, Inc. and the Debtor's assets be liquidated as soon as practicable in the current Chapter 11 case and distributed according to the Plan." One day after HUD submitted its Plan to the bankruptcy court, Jayson and HUD executed a "Memorandum of Understanding" which, by its own terms, "sets forth the agreement between Jayson ... and [HUD] concerning the proposal by Jayson to acquire the [Michigan Beach] property." The Memorandum states that it is intended to supplement the April 16, 1986 letter from Scott Canel to William T. Clabault, the Assistant United States Attorney who represented HUD in the Michigan Beach bankruptcy proceedings. In that letter, Canel had first outlined for HUD the specific terms of Jayson's plan to purchase the property and turn it into a cooperative through extensive ($1.75 million) rehabilitation.

After the original Reorganization Plan and Disclosure Statement were submitted to the bankruptcy court, Jayson and HUD mutually agreed to alter the terms of their agreement in several respects. To reflect those changes, HUD filed an Amended Reorganization Plan and an Amended Disclosure Statement on December 17, 1986. The Amended Plan stated that HUD would take part in financing the project by coinsuring Jayson's first mortgage for the project. Specifically, the Amended Plan indicated that "Jayson, Inc. will satisfy the claim of HUD out of the proceeds of either a GNMA Mortgage backed security or an IDHA taxable bond issue insured under FHA Program 221(d)(3), 12 U.S.C. Section 17151(d)(3), coinsured by Dean, Witter

---

1. The building, which stands 22 stories high and contains 240 units, is located at 7251 South Shore Drive in Chicago, Illinois.

Housing and Real Estate Finance Corp. This loan will require a 50% to 70% presale of cooperative units before funding will be released." [2] The Amended Disclosure Statement revealed that in addition to the loan from Dean, Witter, Jayson would be financing the project in part through a loan from the City of Chicago. The Amended Disclosure Statement also stated that after confirmation of the Amended Plan, a company called Services for Cooperative Condominium Communities, Inc. ("SCCC") would be appointed to manage the property.

In May 1987, Jayson and HUD also amended their initial Memorandum of Understanding—twice. Neither amendment, however, changed the general substance of the parties' agreement. The first amendment merely modified the schedule by which Jayson was to complete its presale of the cooperative units in order to have financing released; the second amendment revised conditions pertaining to the management of the property.

On May 27, 1987, the bankruptcy court entered an order confirming HUD's Amended Plan of Reorganization. Although the order approves the sale of the Michigan Beach property to Jayson for development as a cooperative, the order also states that if Jayson is unable to complete presale of the cooperative units or to obtain permanent financing to satisfy HUD's claim in full, then the Chapter 11 case and the property other than the cash collateral were to be returned to the "status quo."

In that event, the order further provided, Jayson would have no right, title, or interest in the property, and Jayson could bring no claim against HUD in connection with the Chapter 11 case. The bankruptcy court order was the first document concerning the Michigan Beach project which set forth what would happen in the event that Jayson was unable to obtain sufficient financing or sales to allow the cooperative to proceed. None of the other documents to which Jayson and HUD were privy—including the original and amended Reorganization Plan, the original and amended Disclosure Statement, and the original and twice amended Memorandum of Understanding—contained any provision regarding the rights or duties of the parties in the event the cooperative failed.

After the bankruptcy court approved the Amended Plan, SCCC was appointed to manage the property in accordance with that Plan. In addition, Ida Curtis Fisher began marketing the property as a cooperative. Fisher is president of ICF Development Corporation, a company in the business of providing marketing and development services to housing cooperatives. Fisher and ICF had been involved in the planning of the cooperative project from the start. According to Jayson, it was Fisher who initially proposed the idea of turning Michigan Beach into a cooperative as an investment opportunity for Jayson. Upon the approval of the Amended Plan, Fisher marketed the property as Jayson's agent.[3]

**2.** Section 221(d) of the National Housing Act ("NHA"), 12 U.S.C. § 1715*l*(d), in connection with section 244 of the NHA, 12 U.S.C. § 1715z–9, outlines a program under which HUD can coinsure certain mortgages issued by private lenders against the risk of loss. Mortgages eligible for coinsurance by HUD include those used to finance multifamily residential cooperatives such as Michigan Beach.

**3.** Jayson claims that Fisher, in providing consulting services to Jayson on the Michigan Beach project, was acting as HUD's agent as well as Jayson's agent. This assertion, however, is entirely unsupported—and in fact flatly contradicted—by the record in this case. Although HUD admits that Fisher had worked with HUD in the past, the record is clear that Fisher was an independent consultant who was not con-

trolled by HUD and whom Jayson freely selected as its consultant for the Michigan Beach project. For example, Scott Canel's letter of April 16, 1986, to HUD's attorney, William Clabault, states that Jayson's initial proposal to develop the Michigan Beach property was prepared "with the assistance of [Jayson's] outside consultants Ida Curtis Fisher of ICF Development Corp. and James Albrecht of Kendall Mortgage Bankers." Similarly, a March 8, 1988 letter to Clabault from Jay Canel indicates that Jayson was sharing certain information about the project with Fisher but not with HUD. Moreover, in a verified complaint filed in a state court action related to this case, Jayson attests that Fisher and ICF marketed the cooperative pursuant to a contract with Jayson's nominee, the Michigan Beach Housing Cooperative ("the Cooperative"). Jayson further states in its state

While Fisher marketed the cooperative, Jayson attempted to obtain financing for the purchase and rehabilitation of the property. Pursuant to terms of the Amended Plan, Jayson negotiated with Dean, Witter Housing and Real Estate Financing Corp. for a first mortgage, and applied to the City of Chicago for a low interest rate subordinated second mortgage. Although Jayson's application for funding from the City of Chicago was successful, Jayson's negotiations with Dean, Witter eventually broke down. Ultimately, however, Jayson secured a loan commitment from Cincinnati Mortgage Corporation ("CMC"), whom Jayson has joined as an involuntary plaintiff to this action. CMC issued its commitment on July 21, 1988. In the commitment, CMC agreed to make, and to coinsure with HUD under the § 221(d)(3) program, a mortgage loan in the amount of $6,390,100, subject to certain terms and conditions. One of those conditions was that at least 51% of the co-op units had to be sold prior to initial endorsement of the loan. After CMC's loan commitment issued, the bankruptcy court entered an order allowing modification of the Amended Plan to indicate that funding of the project would be through a loan from CMC, not Dean, Witter as the Amended Plan had indicated. The bankruptcy court's order further reflected that an additional loan from the City of Chicago in the amount of $3,295,380 would be secured by a second mortgage on the property.

In September 1988, Jayson designated the Michigan Beach Housing Cooperative ("the Cooperative"), whom Jayson has named as a nominal defendant to this action, as its "nominee" in connection with the Michigan Beach project. As Jayson's nominee, the Cooperative would acquire title to the Michigan Beach property. Jayson, however, would retain control over the implementation of the redevelopment project pursuant to a "Development Services Agreement" between Jayson and the Cooperative.

On September 22, 1988, Fisher, individually and on behalf of ICF, and Ruby C. Stevens, as president of the Cooperative, signed a document certifying, under penalty of perjury, that more than 51% of the cooperative units had been sold to bona fide purchasers. On the basis of Stevens' and Fisher's representation that the 51% presale figure had been achieved, the parties executed the initial closing of the project on September 29, 1988. On that date, Jayson caused title to the property to be conveyed to the Cooperative; the initial endorsement of the first mortgage took place; HUD received full payment of its indebtedness ($4,687,301); and HUD released its mortgage and security agreement.

After the September 1988 closing, Jayson followed through with the development project and substantially rehabilitated the property. By March of 1989, however, Jayson had discovered that, contrary to Stevens' and Fisher's representations, the 51% presale requirement had not been met. Around the same time, CMC also became aware that the 51% presale requirement may not have been satisfied and that the

court complaint that as Jayson's nominee, the Cooperative was designated to hold title to the property as a "shell corporation", with Jayson retaining "overall control [over] the project." *See Jayson Investments, Inc. v. Michigan Beach Housing Cooperative,* No. 89 CH 07944 (Cir. Ct. Cook County) (Verified Complaint For Injunctive and Other Relief at ¶¶ 8, 13, 16). Finally, Fisher herself attests in a sworn affidavit that "Scott Canel . . . selected ICF to serve as marketing agent in connection with the conversion of the Michigan Beach Apartments into a cooperative." In sum, the documents in this case do not even remotely suggest that Fisher was acting as HUD's agent or that Fisher was not acting pursuant to Jayson's direction in marketing the

Michigan Beach cooperative. The only support Jayson offers for its position is an affidavit of one of its own principals, Scott Canel. Canel's affidavit, however, contains nothing which tends to establish that Fisher was HUD's agent on this project. Furthermore, in light of the clear record in this case, Canel's bald assertions that Fisher was not Jayson's agent are simply insufficient to create a genuine material dispute on this issue which would preclude summary judgment. *See Hannon v. Turnage,* 892 F.2d 653, 657 (7th Cir.1990) (Plaintiff cannot rest on mere unsupported denials and must come forward with contradictory evidence of his own to establish a genuine issue of material fact).

project was experiencing cash flow problems.[4] Shortly thereafter, Jayson and CMC became doubtful that the plan to turn Michigan Beach into a cooperative could be financially successful. Nevertheless, Jayson and CMC determined that the project could be saved financially if Michigan Beach was turned into a low-income rental building. Jayson claims that prior to the September 1988 closing, agents for HUD, including Clabault and Albert Sullivan, whom Jayson describes as "a HUD official," assured Jayson that in the event the cooperative failed, HUD would: (1) permit Jayson to convert the property into rental housing; and (2) cooperate in causing title to the property to be conveyed to Jayson for the purpose of effectuating the conversion.[5] Therefore, CMC and Jayson turned their efforts toward converting Michigan Beach into low-income rental housing.

In order to accomplish such a conversion, in February 1990 the Cooperative and Jayson entered into Transfer of Physical Assets Agreement ("TPAA"). Under the TPAA, the Cooperative agreed to transfer ownership of the Michigan Beach property to Jayson in order to allow Jayson to operate the project as a rental building. In return, Jayson agreed to reimburse the Cooperative for its investment in the project and to indemnify the Cooperative for any liability on its part associated with the building. Under federal regulations, the TPAA required HUD approval. See 24 C.F.R. Part 265. Therefore, Jayson and CMC applied to HUD in April 1990 for approval of the TPAA.

On July 3, 1990, Frank Brown, HUD's Director of Insured Multifamily Housing in Washington, D.C., replied to the request for approval of the TPAA. Brown's letter stated that the TPAA could be approved, and final endorsement of the project given, only with a debt service mortgage of $5,324,500. This amount is $1,065,600 less than the original $6,390,100 mortgage which HUD had agreed to coinsure with the property operating as a cooperative. The practical effect of HUD's willingness to issue approval of the TPAA only under this lower mortgage amount was that Jayson would have to pay down the mortgage by roughly $1 million before the TPAA could be approved and the property converted into rental housing.

Jayson balked at HUD's demand that Jayson come up with an additional $1 million for conversion of the property. CMC, Jayson, and HUD then conducted negotiations in an attempt to settle the matter, but the parties were unable to reach an accord. CMC and Jayson have refused to pay down the mortgage by more than about $500,000, while HUD has insisted on approximately a

**4.** The record is clear that the 51% presale requirement was not satisfied. HUD's Statement of Facts in support of its motion for summary judgment, submitted pursuant to Rule 12(*l*) of the Local Rules of the Northern District of Illinois, states in paragraph 22 that "by March of 1989, both Jayson and CMC knew that the certification of the 51% presale requirement had been false." In their Rule 12(m) responses to HUD's statement of facts, both Jayson and the Cooperative expressly state that they do not contest HUD's paragraph 22. Moreover, Jayson has filed a law suit in state court against Fisher, ICF, the Cooperative, CM, and others alleging, *inter alia,* that Fisher and Stevens intentionally misrepresented that the 51% presale requirement had been satisfied. *See Jayson Investments, Inc. v. Michigan Beach Housing Cooperative,* No. 89 CH 07944 (Cir. Ct. Cook County). In CMC's Rule 12(m) response, CMC denies that it *knew* by March 1989 that the certification of the presale requirement was false; CMC admits only that as of March 1989 it became aware that the requirement *may not* have been met. However, CMC has never contested the fact that the 51% requirement was not in fact met by the date of the initial closing. Such a position would be untenable on the part of CMC, since it sent a letter to HUD on July 31, 1990, acknowledging that the presale requirement had not been satisfied. The only evidence in the record suggesting that the presale requirement was met is Fisher's unsupported affidavit. For purposes of deciding this suit, however, Fisher's position is irrelevant, since the parties do not contest that the presale requirement was not met.

**5.** HUD denies that any HUD representative promised to anyone that the Michigan Beach project could be converted into rental units in the event the cooperative failed. However, HUD has conceded that such statements were made solely for the purpose of argument on this motion. HUD maintains that even assuming such statements were made, Jayson fails to state a claim on which relief may be granted.

$1 million buy-down.[6]

Unable to reach an accord with HUD on the terms of a rental conversion, Jayson and CMC apparently reevaluated the viability of the property as a cooperative. On July 13, 1990, they submitted to HUD a request that HUD proceed with its final endorsement of the property as a cooperative. Final endorsement by HUD is required in order to trigger HUD's mortgage insurance for the project. Three days after submitting its request to HUD for final endorsement, Jayson filed this lawsuit. The amended complaint asks the court to issue an injunction requiring HUD to execute final endorsement of the loan, and further requests the court to order HUD to allow the TPAA to proceed. CMC and the Cooperative have urged the court to grant the requested relief.

HUD has refused to execute final endorsement of the loan or to approve of the TPAA except under the terms outlined by Brown which, as indicated above, require a reduction of over $1 million in the amount of the mortgage to be coinsured HUD. HUD bases its refusal of final endorsement on the fact that misrepresentations were made concerning the 51% presale requirement. HUD contends, and Jayson has not contested, that HUD would not have executed the initial endorsement of the project if HUD had been aware that the 51% presale requirement was not satisfied. HUD further maintains that it is not required to give its approval of the TPAA.

## DISCUSSION

Jayson and CMC advance several arguments in support of their position that HUD is required to execute final endorsement of the CMC mortgage and approve of the conversion of the Michigan Beach project from a cooperative to rental property. The court will address each of those arguments separately.

## I. The Written Contract Concerning the Michigan Beach Project

Jayson first argues that HUD is contractually obligated to execute final endorsement of the CMC mortgage. There is no dispute that pursuant to the various documents outlining the details of the Michigan Beach project, including the modified Amended Reorganization Plan, the Amended Disclosure Statement, and the twice-amended Memorandum of Understanding, HUD agreed in writing to allow Jayson to purchase Michigan Beach and develop it as a cooperative. That contract contemplated Jayson's purchase of Michigan Beach through a loan from CMC, and HUD's coinsurance of the mortgage securing that loan. Final endorsement of the CMC mortgage is the last step required by HUD to provide such coinsurance. Thus, Jayson claims, final endorsement is required by HUD under the contract for the Michigan Beach project.

HUD's agreement to allow Jayson to purchase and develop Michigan Beach, however, was based on certain terms and conditions precedent. A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. Where the condition is not fulfilled, performance is not required. 5 S. Williston, *A Treatise on The Law of Contracts,* § 663 (3d ed. 1981); *see also Godare v. Sterling Steel Casting Co.,* 103 Ill.App.3d 46, 51, 58 Ill.Dec. 588, 592, 430 N.E.2d 620, 624 (1981). One of the conditions precedent to the agreement concerning the Michigan Beach project is particularly important in the instant case. The modified Amended Plan and Amended Disclosure Statement specifically set forth that pursuant to the terms of CMC's loan commitment to Jayson, CMC was not obligated to issue its loan to Jayson, and HUD was not obligated to coinsure the mortgage securing that

---

**6.** The parties are apparently in agreement that converting the Michigan Beach property into rental housing is the best way, if not the only way, to avoid a total financial debacle. Thus, the parties' stubbornness in failing to reach an accord on the exact terms of such an arrangement could prove financially disastrous for all concerned, since each party in this case has a substantial financial interest in the property. In the end, HUD, Jayson, and CM may all lament that their obstinate posture during settlement negotiations was short-sighted.

loan, unless 51% of the cooperative units had been sold by the date of the initial endorsement. The Amended Plan expressly provided that in the event the presale requirement was not met, the project would not go through and the property would return to the "status quo."

Although Fisher and Stevens certified prior to initial endorsement that the 51% requirement had been achieved, the record is clear in this case that the 51% presale requirement was, in fact, never satisfied. Solely because of that fact, HUD has refused to issue final endorsement of the CMC mortgage. Since, as noted above, the 51% presale requirement was clearly a material precondition to HUD's coinsurance of the mortgage, HUD's refusal to proceed with final endorsement does not amount to a breach of its agreement to allow Jayson to purchase and develop the Michigan Beach property.

## II. HUD's Alleged Oral Representations Concerning Conversion of the Michigan Beach Project

### A. Oral Contract

■ Jayson next claims that HUD is required to issue final endorsement based on the representations of Clabault and Sullivan, on behalf of HUD, that HUD would allow conversion of the Michigan Beach project to rental housing in the event the cooperative failed. Jayson describes these representations as follows:

> On many occasions prior to December 17, 1986, HUD, acting by and through its authorized agents and attorneys including Albert Sullivan and William Clabault, made both oral offers to the principals of Jayson and made representations to them on behalf of HUD that if Jayson would act as developer of the Property and would work as sponsor of the project with the Cooperative, ICF, and SCCC, then HUD, if the cooperative conversion failed, would (1) permit Jayson to convert the property into rental housing and (2) would cooperate in causing title to the property to be conveyed to Jayson.

Amended Complaint at ¶ 12. Ordinarily, contracts which modify the interests of the parties in real estate must be in writing to be enforceable under the statute of frauds. Ill.Rev.Stat. ch. 59, ¶ 2 (1989). *See Nelson v. Estes*, 154 Ill.App.3d 937, 940, 107 Ill. Dec. 617, 619, 507 N.E.2d 530, 532 (1987). However, Jayson claims that even though HUD's representations were made orally, they created a contract because the representations were "clear and unequivocal." Jayson's Memorandum at 22 (citing *Heitz v. Circle Four Realty Co., Inc.*, 191 Ill. App.3d 727, 138 Ill.Dec. 781, 548 N.E.2d 11 (1989)).

■ The court disagrees. The terms of HUD's purported representations are so vague that this court cannot possibly conclude that Jayson has sufficiently plead the existence of an enforceable contract. HUD's obligations under the purported contract are apparently triggered only if the cooperative "fails." This term is totally ambiguous. There are no parameters for what constituted "failure" of the cooperative, when it is to be determined whether the cooperative "failed," and who is to make that determination. Moreover, if the cooperative "fails," HUD is purportedly obligated to "permit" Jayson to convert the property to rental housing. What constitutes "permission"—that is, the specific terms under which HUD must allow conversion—is also vague and ambiguous. Arguably, by agreeing to allow the conversion under a $1 million dollar buy-down, HUD has already agreed to "permit" such a conversion to take place. Thus, the court finds that the terms of the alleged oral contract are too ambiguous to be enforced.

■ Furthermore, in addition to its ambiguity, Jayson's oral contract claim suffers from another obstacle. Where procedures and guidelines have been established for the creation of a contract with a government agency, those criteria must be satisfied in order to create a binding contract with the government. *See Frangella Mushroom Farms, Inc. v. United States*, 229 Ct.Cl. 578, 581–82 (1981); *Empresas Electronicas Walser, Inc. v. United States*, 223 Ct.Cl. 686, 688, 650 F.2d 286 (1980). In addition, "[t]he government officer whose conduct is relied upon must have

had actual authority to bind the government in contract." *ATL, Inc. v. United States*, 4 Cl.Ct. 672, 675 (1984) (citing *Pacific Gas & Electric Co. v. United States*, 3 Cl.Ct. 329, 338–39 (1983)), *aff'd*, 735 F.2d 1343 (Fed.Cir.1984).

■ In the instant case, specific federal regulations govern the rental conversion which Clabault and Sullivan allegedly promised HUD would permit. *See* 24 C.F.R. Part 265. Among other things, these regulations provide that such a conversion can only occur where a written application for such a transfer is made (§ 265.9), where certain criteria for approval are satisfied (§ 265.10), and where HUD issues *written* approval of the conversion (§ 265.5). It is undisputed that these requirements were not satisfied prior to Clabault's and Sullivan's alleged promises to allow conversion. Thus, Clabault and Sullivan clearly did not have the authority to bind HUD in an oral contract to allow conversion. As a result, Jayson's oral contract claim must be rejected.

B. Estoppel

■ Jayson claims that even if the statements of Clabault and Sullivan did not create an oral contract, those statements estop HUD from refusing to issue final endorsement of the CMC mortgage and from refusing to approve of the conversion of the Michigan Beach project to rental housing.

Just last term, the Supreme Court was confronted with a case involving an estoppel claim against the federal government: *Office of Personnel Management v. Richmond*, —— U.S. ——, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). In that case, the Court acknowledged that federal courts have not uniformly resolved the issue of what circumstances, if any, justify allowing an estoppel claim to proceed against the federal government or its agencies. *Id.* 110 S.Ct. at 2470. The Court, however, did not remedy this confusion. The Solicitor General advocated an across-the-board rule barring estoppel claims against the government, but the court refused to issue such a broad ruling, stating, "We leave for another day whether an estoppel claim could ever suc-

ceed against the government." *Id.* at 2471. Instead, the court narrowly ruled that an estoppel claim does not lie against the government where the plaintiff seeks to recover money to be paid out of the Treasury in violation of a federal statute. *Id.* at 2476. Thus, aside from this narrow holding, after *Personnel Management* federal courts must continue to struggle with the appropriate parameters of estoppel claims against the federal government.

In this Circuit, our appellate court has acknowledged the general rule that principles of estoppel are not applicable against the federal government or its agencies. *Edgewater Hospital, Inc. v. Bowen*, 857 F.2d 1123, 1138 (7th Cir.1988); *Crown v. United States Railroad Retirement Board*, 811 F.2d 1017, 1021 (7th Cir.1987). At the same time, however, our Circuit Court has held that under certain "narrowly-defined" circumstances, principles of estoppel may be invoked to prevent the government from refusing to fulfill the unauthorized promises of its agents. *Id.* In *Portmann v. United States*, 674 F.2d 1155 (7th Cir.1982), the court held that an estoppel theory may be asserted against a government agency only where the following elements are present:

> First, the party to be estopped must know the facts. Second, this party must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct.

674 F.2d at 1167. Decisions since *Portmann* have confirmed the existence of a fifth requirement: the party asserting estoppel must establish that the government's action amounted to "affirmative misconduct." *See Edgewater Hospital*, 857 F.2d at 1138; *but see Azar v. United States Postal Service*, 777 F.2d 1265, 1271 (7th Cir.1985) ("[A]ffirmative misconduct is not a requirement in the unique situation in which a party seeks to estop the Postal

Service from relying on Express Mail insurance limits.")

Applying these requirements in the instant case, the court finds that Jayson's estoppel claim must fail. To satisfy the fourth element of an estoppel claim against HUD, Jayson must establish that its reliance on the statements made by Clabault and Sullivan was objectively reasonable. *Azar*, 777 F.2d at 1269–70. Jayson is unable to make such a showing under the facts of this case. As the court has already pointed out, the conversion of the Michigan Beach project from a cooperative to rental housing required the satisfaction of various regulatory procedures and criteria, including written approval from HUD. Jayson was apparently aware of those regulatory requirements, since prior to instituting this action it applied to HUD for approval of the TPAA. Moreover, even if Jayson was not actually aware of those requirements, it should have been aware of them. Both of Jayson's principal shareholders are attorneys, and the applicable information was readily discoverable to them. *See, e.g., United States v. Arkwright, Inc.*, 690 F.Supp. 1133, 1143 (D.N.H.1988) (party dealing with government agents is expected to know the law). Further, all of the other aspects of the parties' agreement were reduced to writing. The Memorandum of Understanding was amended twice and the Reorganization Plan and Disclosure Statement also were modified several times to reflect mutually agreed upon changes in the Michigan Beach project. Under these circumstances, Jayson's reliance on the alleged oral representations of Clabault and Sullivan regarding a vital aspect of the parties' agreement was wholly unreasonable.

In addition to outlining the several elements which must be satisfied in order to state an estoppel claim against the government, the *Portmann* court also listed other factors which should be considered in determining whether to grant relief against the government under an estoppel theory. Among those factors is the potential danger of undermining important federal interests and the risk of a severe depletion of the public fisc. 674 F.2d 1167. In this court's view, both of those factors militate against estopping HUD in this case. Estopping the government in this case will undermine the integrity of the statutes and regulations under which HUD's coinsurance program operates. Those provisions outline guidelines and procedures which are critical to the efficient and responsible management of the coinsurance program. Moreover, estoppel of HUD would result in requiring HUD to give its approval to a project which has not met the applicable criteria for approval. This could result in substantial losses to HUD, which would impinge on HUD's financial ability to engage in other projects which have met the applicable criteria. Therefore, this court finds that an estoppel claim does not lie against HUD under the facts of this case.

### III. The Statutory and Regulatory Structure of the Coinsurance Program

■ Jayson and CMC also claim that HUD is obligated to proceed to final endorsement based on the statutory and regulatory structure of the coinsurance program. CMC argues that under the § 221(d) coinsurance program, final endorsement of a mortgage is a *pro forma* act. According to CMC, once a loan commitment is issued from an approved coinsuring lender and initial endorsement of the mortgage securing that loan is executed, HUD is stripped of any discretion to refuse to coinsure the mortgage, and HUD is obligated to proceed to final endorsement at that point. In support of this position, CMC cites three opinions in one case: *Housing Study Group v. Kemp*, 739 F.Supp 633 (D.D.C. May 16, 1990); 736 F.Supp. 321 (April 25, 1990); and 732 F.Supp. 180 (February 6, 1990).

In the *Housing Study* litigation, the plaintiffs, a group of mortgage bankers with authority to act as coinsuring lenders under HUD's coinsurance program, filed suit to enjoin HUD from enforcing new rules which HUD promulgated to tighten its control over the operation of the coinsurance program. One of the rules prohibited coinsuring lenders from issuing loan

commitments under the coinsurance program unless the lender received written notification from HUD that HUD had "reviewed and found to be acceptable the underwriting and related loan commitment determinations made by the lender." 732 F.Supp. at 183–84 (quoting HUD Coinsuring Lender Letter No. 90–1). Another rule advised coinsuring lenders that loan commitments issued under the coinsurance program would not be honored by HUD until HUD determined that the commitments are "legally binding." 732 F.Supp. at 184 (quoting Coinsuring Lender Letter No. 90–2). Plaintiffs, claiming that HUD's new rules were promulgated without following the administrative rulemaking procedures required by § 4 of the Administrative Procedure Act, 5 U.S.C. § 553, sought to enjoin HUD from enforcing the new rules.

The court granted a preliminary and subsequently a permanent injunction. 736 F.Supp. at 336; 739 F.Supp. at 640. In the court's first opinion, it noted that HUD's new rules substantively "change the standard operating procedures of the coinsurance program." 732 F.Supp. at 185. In a footnote in its second opinion in the case, the court remarked that under the coinsurance program prior to HUD's proposed rule changes, "[e]ndorsement is a *pro forma* act." 736 F.Supp. at 326 n. 5. The court made this comment in emphasizing that under HUD's coinsurance program without the proposed rule changes, HUD generally does not get involved in the underwriting of the loan; underwriting functions, the court pointed out, are handled by the coinsuring lender. *Id.* The court noted that under the new rules, however, HUD would be involved in underwriting decisions. The court's third opinion reiterated its finding that the new rules embodied substantive changes which significantly altered the rights and interests of approved coinsuring lenders. 739 F.Supp. at 635. In granting an injunction, the court ruled that these substantive changes in the operation of the coinsurance program were initiated in violation of the Administrative Procedure Act. *Id.*

CMC claims that the remarks by the *Housing Study* court demonstrate that without HUD's rule changes, which *Housing Study* has ruled invalid, the coinsuring lender has the authority to bind HUD to a contract of coinsurance on any qualified mortgage which the coinsuring lender, in its discretion, issues. Thus, using the *Housing Study* decisions, CMC argues that HUD has no right to refuse its final endorsement of the CMC mortgage.

In this court's view, however, CMC has construed the *Housing Study* decisions much too broadly. The *Housing Study* decisions did not hold that HUD *must* proceed to final endorsement in all cases once a loan commitment is issued by an approved lender. In fact, the *Housing Study* court did not even purport to exhaustively analyze the nature of HUD's obligation to issue final endorsement, since such an inquiry was not required for its decisions in the case. All that was required in the *Housing Study* decisions was an analysis of whether HUD's rule changes substantively modified the operation of the coinsurance program. To conduct such an analysis, the *Housing Study* court examined how the coinsurance program functions—in *general* terms—without the proposed changes. The court did not purport to address any specific applications of the coinsurance program without the rule changes.

Most importantly, the *Housing Study* court certainly did not address whether HUD must execute final endorsement where the initial endorsement is based on a misrepresentation. That issue—which is the issue presented in this case—is specifically addressed in the statutes and federal regulations governing HUD's coinsurance program. The National Housing Act, 12 U.S.C. § 1701 *et seq.*, provides:

> [T]he validity of any contract of insurance ... shall be incontestable in the hands of an approved financial institution or approved mortgagee from the date of execution of such contract, except for fraud or misrepresentation on the part of such financial institution or approved mortgagee.

12 U.S.C. § 1709(e). Similarly, federal regulations provide:

The Contract of Coinsurance will terminate if ... the lender ... commit[s] fraud or make[s] a material misrepresentation to the Commissioner with respect to the Contract of Coinsurance on the Mortgage.

24 C.F.R. § 251.813(a)(6).

In the instant case, it is undisputed that the lender, CMC, made a material misrepresentation to HUD regarding the contract of coinsurance. Based on Fisher's and Stevens' representations, CMC informed HUD that the 51% presale requirement had been satisfied, when in fact the requirement had not been met. Under 12 U.S.C. § 1709(e) and 24 C.F.R. § 251.813(a)(6), this material misrepresentation gave HUD the right to terminate its contract of coinsurance for the Michigan Beach project.[7]

In an apparent retreat from its initial position that endorsement is a *pro forma* act, CMC concedes that fraud or misrepresentation "provide[s] the sole basis upon which HUD may refuse to proceed to final endorsement." CMC's Memorandum at 24 (citing § 251.813(a)(6)). CMC argues, however, that neither § 1709(e) nor § 251.813(a)(6) apply in this case because CMC is "innocent of any wrongdoing." CMC contends that to the extent there was fraud or misrepresentation in connection with the contract of coinsurance, it was committed by Jayson's agent, Ida Fisher, and the Cooperative's agent, Ruby Stevens, not by anyone associated with CMC.

However, the record is clear that prior to initial endorsement, HUD was notified in a September 29, 1988 letter from CMC that "all conditions of the Firm Commitment have been satisfied." As previously discussed, all the parties were aware that one of the conditions of CMC's firm commitment was that the 51% presale requirement be satisfied. Since this condition was not in fact satisfied, CMC's September 29, 1988 letter to HUD contained a misrepresentation regarding that condition. HUD proceeded with initial endorsement based on that misrepresentation.

CMC also argues that HUD cannot refuse final endorsement based on fraud or misrepresentation because there is no evidence that its representation regarding the satisfaction of the 51% presale requirement was made knowingly or intentionally. CMC claims the record is clear that in representing to HUD that the 51% presale requirement had been met, CMC specifically relied on the presale certification of Fisher and Stevens, which CMC assumed was correct.

 Even if this is true, however, nothing in § 1709(e) or § 251.813(a)(6) suggests that those provisions apply only to knowing and intentional misrepresentations and not to those made innocently or negligently. In fact, a logical reading of the language in the § 1709(e) and § 251.813(a)(6) suggests just the opposite. Both provisions are written in the disjunctive; they allow HUD to terminate a contract of insurance for fraud *or* misrepresentation. Construing "misrepresentation" as it is used in those provisions as meaning only "knowing and intentional misrepresentations" would make the provisions redundant, since the only element which separates mere misrepresentation from fraud is knowledge of falsity with intent to deceive. It is a well-settled rule of statutory construction that, if possible, courts should give effect to each and every word in a statute, and should avoid constructions of a statute that result in any portion of the statute being redundant or superfluous. *See Thurner Heat Treating Corp. v. N.L.R.B.*, 839 F.2d 1256, 1259 (7th Cir.1988). In line with that time-honored rule, CMC's reading of § 251.813(a)(6) and § 1709(e) must be rejected. *See Jay F. Zook, Inc. v. Brownstein*, 237 F.Supp 800, 807–08 (N.D.Ohio 1965) (interpreting § 1709(e) similarly).

 Jayson attempts to circumvent the plain effect of § 1709(e) and § 251.813(a)(6) by arguing that HUD had an independent duty to investigate whether the 51% presale requirement had been satisfied. As a result of this independent duty, Jayson ar-

---

7. Technically, both § 1709(e) and § 251.813(a)(6) provide only that HUD may terminate a contract of insurance, not that HUD may refuse to enter into one, as HUD has done here by refusing to execute its final endorsement of the CMC mortgage. However, it would be ridiculous to construe § 1709(e) or § 251.813(a)(6) as requiring HUD to first enter into the contract of insurance by endorsing the mortgage, and thereafter terminate the contract.

gues, HUD cannot refuse final endorsement on the basis of CMC's misrepresentation that the 51% presale requirement had been met, since HUD should have investigated that fact itself.

However, none of the documents relating to the Michigan Beach project establish any duty on the part of HUD to investigate whether the 51% presale requirement had been met. In addition, none of the relevant statutory or regulatory provisions support the existence of such a duty. In fact, the National Housing Act and the regulations promulgated thereunder establish a scheme under which the coinsuring lender has the responsibility to perform virtually all of the substantive tasks in connection with the implementation of particular coinsurance projects, with only a select group of functions designated as being the responsibility of HUD. *See, e.g.,* 24 C.F.R. § 251.301(a).

The only evidence which Jayson offers to support such a duty is certain provisions contained in HUD's Cooperative Handbook. By its terms, however, that handbook applies only when HUD participates in the financing of a cooperative by issuing full insurance, not coinsurance. In the coinsurance context, as previously noted, the coinsuring lender assumes the responsibilities assigned to HUD in the full insurance context. Moreover, even if the handbook's provisions applied in the coinsurance context, there is no basis for allowing Jayson to enforce provisions of HUD's handbook in a private cause of action where those provisions are not incorporated into the written documents outlining the Michigan Beach project or the federal regulations and statutes governing HUD's conduct. Thus, the court finds that none of those provisions in the Cooperative Handbook imposes an enforceable duty on HUD to review cooperative applicants and determine whether they meet appropriate credit criteria where HUD is acting as a coinsurer. Accordingly, the court rejects Jayson's argument that HUD did not have the right to refuse final endorsement pursuant to § 1709(e) and § 251.813(a)(6).

### IV. *Equitable Concerns*

CMC and the Cooperative make one final argument in support of their position that HUD is required to execute final endorsement of the project. They claim that HUD's decision not to proceed to final endorsement ignores the fact that tremendous financial hardship will result if the Michigan Beach project collapses; they further claim that the decision disregards HUD's obligation to provide affordable housing for low and moderate income families. CMC and the Cooperative argue that by ignoring these concerns, HUD is acting arbitrarily and capriciously.

As this court has already noted, however, under the statutes and regulations applicable to the coinsurance program, HUD can legally refuse to proceed to final endorsement on the CMC mortgage. Since HUD is empowered to exercise that decision, this court must allow HUD's decision to stand. While HUD does have a duty to work toward providing affordable low-income housing, that duty does not require HUD to participate in every proposed housing project; the National Housing Act outlines a broad scheme of restrictions, conditions, and procedures which must be considered in HUD's implementation of that goal. Congress has empowered HUD to exercise its discretion in this area; this court cannot substitute its own judgment for that which is properly vested in a federal agency. This is not to say that this court is callous to the parties' concerns that HUD's failure to endorse the project could result in substantial financial hardship. To the contrary, the court has encouraged the parties to try to reach an accord which would be financially beneficial to all concerned. However, as a practical and legal matter, this court cannot compel HUD or any other party to do what it is not legally obligated to do.

### CONCLUSION

For the foregoing reasons, summary judgment is entered in favor of HUD, and this case is dismissed.

IT IS SO ORDERED.